## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

ESTATE OF VINCENT CHACON, by and through its personal representative Angela Hernandez, and
ANGELA HERNANDEZ,

     Plaintiffs,

v.

CITY AND COUNTY OF DENVER, COLORADO;
ELIAS DIGGINS, in his individual and official capacities;
(F/N/U) LAING, in her individual and official capacity;
(F/N/U) KERBELIS, in his individual and official capacities;
J. DOE, in his/her/their individual and official capacities;
SERGIO MORALES, in his individual and official capacities;
DARKO LUKAJIC, in his individual and official capacities;
J. ROE, in his individual and official capacities;
ANNALISSA REYNOLDS, in her individual and official capacities; and
JOSÉ GURLÉ, JR., in his individual and official capacities,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs, by and through their attorneys, Mari Newman, Andy McNulty, and Madeline Leibin of NEWMAN | MCNULTY, LLC, allege for their Complaint and Jury Demand as follows:

### INTRODUCTION

1. Vincent Chacon was a non-violent man booked into the Denver jail for a minor offense. Instead of going home to his friends and family, Mr. Chacon left the Denver jail as a corpse. He was murdered because City and County of Denver ("Denver") Sheriff Department ("DSD") deputies placed an extremely violent and dangerous man, high on methamphetamine, into his cell and then ignored his cries for help as that man strangled him to death. Not only were

Denver's actions negligent, they were callous and deliberately indifferent. They violated Chacon's constitutional rights.

2.      Defendants locked Ricky Roybal-Smith, a repeat offender with a long rap sheet into Mr. Chacon's cell. Denver classified Roybal-Smith as a dangerous Level 1, maximum-security inmate. He arrived at the Denver jail after having murdered two people, and only hours after a drug-fueled hit-and-run. He was a violent career criminal.

3.      In contrast, Mr. Chacon had no history of violent crime and was being held on a minor offense. He was classified as a Level 4, medium-security inmate.

4.      Denver's own classification system is supposedly designed to separate detainees so that violent criminals like Roybal-Smith do not victimize non-dangerous detainees like Mr. Chacon. But, in practice, Denver consciously allows its deputies to ignore the classification system and lock dangerous detainees into the same cell as non-dangerous detainees. And, it allows them to fail to monitor the detainees that they place into harm's way.

5.      Within hours of Denver placing Roybal-Smith into Mr. Chacon's cell, Roybal-Smith strangled Mr. Chacon to death. For a full hour before his death, DSD officials ignored Mr. Chacon's cries for help.

6.      When DSD officials finally opened the cell, they tried to pass Mr. Chacon's death off as an accident, claiming he had choked on an apple, despite obvious signs of strangulation. He had not. The Denver Office of the Medical Examiner determined that Mr. Chacon died of asphyxia due to external compression of the neck, and ruled the manner of death a homicide.

7.      Mr. Chacon's death was no aberration. Denver has known for years that its jail is dangerous, that its deputies fail to protect the people in their custody, and that its classification and supervision systems are broken. Denver was warned again and again, but chose to take no

action to improve inmate safety. Mr. Chacon paid for Denver's deliberate indifference with his life.

8.    Mr. Chacon's mother, Angela Hernandez, brings this case to ensure that being held as a detainee by the DSD is not a death sentence.

## PARTIES

9.    The decedent, Mr. Chacon, was, at all times relevant to this Complaint, a pretrial detainee in the custody of the DSD at the Downtown Detention Center ("DDC"). He was a citizen of the United States and a resident of Colorado.

10.    Plaintiff Angela Hernandez is the mother of Mr. Chacon and the personal representative of his Estate. She brings these claims individually and on behalf of the Estate of Mr. Chacon. At all times relevant to this Complaint, Ms. Hernandez was a citizen of the United States and a resident of Colorado.

11.    Defendant Denver is a municipal corporation organized under the laws of the State of Colorado. Denver operates the DSD and the DDC. Denver is a person subject to suit under 42 U.S.C. § 1983 and is responsible for the policies, customs, training, supervision, and discipline of the DSD and its deputies.

12.    Defendant Elias Diggins is the Sheriff of Denver. He is the final policymaker for the DSD and is responsible for its policies, customs, training, supervision, and discipline. He is sued in his individual and official capacities. At all times relevant to this Complaint, Defendant Diggins acted within the scope of his official duties and employment and under color of state law.

13.    Defendant Captain (f/n/u) Laing (badge number S14011) was, at all times relevant to this Complaint, a captain employed by the DSD and the watch commander on duty,

responsible for supervising the deputies and operations of the DDC. She is sued in her individual and official capacities. At all times relevant to this Complaint, Defendant Laing acted within the scope of her official duties and employment and under color of state law.

14.    Defendant Sergeant (f/n/u) Kerbelis (badge number S14046) was, at all times relevant to this Complaint, a sergeant employed by the DSD and responsible for supervising the second and third floors of the DDC, including the 2C housing unit. He is sued in his individual and official capacities. At all times relevant to this Complaint, Defendant Kerbelis acted within the scope of his official duties and employment and under color of state law.

15.    Defendant J. Doe is an unknown DSD deputy whose identity is not yet known to Plaintiffs but will be determined through discovery. On the evening of June 29, 2025, Defendant Doe was responsible for processing the housing assignment of Ricky Roybal-Smith at the DDC. Despite having access to Denver's own inmate management system, which reflected that Roybal-Smith was a Level 1 Maximum inmate, Defendant Doe placed him in cell 2C-102 with Mr. Chacon, a Level 4 Medium detainee. Defendant Doe is sued in his/her/their individual and official capacities. At all times relevant to this Complaint, Defendant Doe acted within the scope of his/her/their official duties and employment and under color of state law.

16.    Defendant Sergio Morales (badge number S24080) was, at all times relevant to this Complaint, a deputy employed by the DSD. On the night of June 29, 2025, and the morning of June 30, 2025, records reflect rounds activity in the 2C housing unit logged under his badge number during the hours preceding the murder of Mr. Chacon. He is sued in his individual and official capacities. At all times relevant to this Complaint, Defendant Morales acted within the scope of his official duties and employment and under color of state law.

17.    Defendant Darko Lukajic (badge number S17056) was, at all times relevant to this Complaint, a deputy employed by the DSD and assigned to the 2C housing unit where Mr. Chacon was held. He is sued in his individual and official capacities. At all times relevant to this Complaint, Defendant Lukajic acted within the scope of his official duties and employment and under color of state law.

18.    Defendant J. Roe is an unknown DSD deputy whose identity is not yet known to Plaintiffs but will be determined through discovery. On the evening of June 29, 2025, Defendant Roe was assigned to the 2C housing unit at the DDC where Mr. Chacon was held and was responsible for conducting rounds. Defendant Roe is sued in his/her/their individual and official capacities. At all times relevant to this Complaint, Defendant Roe acted within the scope of his/her/their official duties and employment and under color of state law.

19.    Defendant Annalissa Reynolds (badge number S22018) was, at all times relevant to this Complaint, a deputy employed by the DSD and assigned to the 2C housing unit at the DDC where Mr. Chacon was held. She is sued in her individual and official capacities. At all times relevant to this Complaint, Defendant Reynolds acted within the scope of her official duties and employment and under color of state law.

20.    Defendant José Gurlé, Jr. (Major, Operations Division) was, at all times relevant to this Complaint, a major employed by the DSD and assigned to the Operations Division. On the morning of June 30, 2025, Defendant Gurlé sent the official death-in-custody notification to Sheriff Diggins and other senior DSD officials characterizing Mr. Chacon's death as a choking accident, notwithstanding that responding deputies had already documented visible strangulation bruising around Mr. Chacon's neck. He is sued in his individual and official capacities. At all

times relevant to this Complaint, Defendant Gurlé acted within the scope of his official duties and employment and under color of state law.

21.     Defendants Diggins, Laing, Kerbelis, Doe, Morales, Lukajic, Roe, Reynolds, and Gurlé are referred to collectively as the "Individual Defendants."

## **JURISDICTION AND VENUE**

22.     This action arises under the Constitution and laws of the United States and the State of Colorado. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

23.     Jurisdiction supporting Plaintiffs' claims for attorney fees and costs is conferred by 42 U.S.C. § 1988.

24.     This Court has supplemental jurisdiction over Plaintiffs' claims arising under Colorado law pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

25.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

## **FACTUAL ALLEGATIONS**

### **Vincent Chacon was a beloved son, brother, and friend being held on a minor offense.**

26.     To the DSD, Vincent Chacon was inmate number 785192. To Angela Hernandez, he was her son, a brother to his siblings, and a devoted friend.

27.     On or about June 26, 2025, Mr. Chacon was booked into the DDC on a failure to appear warrant issued by the Lone Tree Police Department for alleged shoplifting, with bail set at just $750. He had not been convicted of any crime. He was a pretrial detainee, and he was working through the court system to secure his release.

28.     Denver classified Mr. Chacon as a Level 4, medium-security inmate. He posed no danger to anyone. He was housed in cell 2C-102 in the 2C housing unit of the DDC.

**<u>Ricky Roybal-Smith is a violent career criminal who had just killed two men and was arrested during a drug-addled crime spree</u>**.

29.     Ricky Roybal-Smith is a repeat violent offender with a criminal record stretching back more than fifteen years. Before he was booked into the DDC, he had been on parole five separate times since 2011 and had reoffended each time. His prior convictions included assault, a 2015 vehicular assault, and a 2022 weapons offense.

30.     In the early morning hours of June 29, 2025, Roybal-Smith stabbed two men to death in two separate attacks. His victims, Jesse Shafer and Scott Davenport, were killed within about an hour of one another.

31.     Later that same day, at approximately 2:40 p.m., Roybal-Smith struck two pedestrians in a hit-and-run. Police found him after another crash, with a syringe partially filled with suspected narcotics, methamphetamine, beside him. He was arrested for driving under the influence of drugs, careless driving, and leaving the scene of an accident, and he was brought to the DDC.

32.     On information and belief, when Roybal-Smith was brought to the DDC, he was under the influence of methamphetamine, and Denver and the Individual Defendants knew that Roybal-Smith was high.

33.     Denver classified Roybal-Smith as a Level 1, maximum-security inmate, the most dangerous classification in its jail.

34.     Denver had actual, documented notice in its own database that Roybal-Smith was a dangerous Level 1, maximum-security inmate when it placed him in a shared cell with Mr. Chacon.

**Denver and the Individual Defendants locked a Level 1 maximum-security killer in the same cell as a Level 4 non-violent detainee.**

35.     Denver's classification system supposedly exists to identify dangerous inmates and to keep them separated from the vulnerable, non-violent people in its custody. A Level 1, maximum-security inmate sits at the top of that danger scale. A Level 4 inmate held on a failure to appear for a non-violent charge sits near the bottom. Denver's system is designed to keep those populations apart.

36.     Denver and the Individual Defendants did the opposite in accordance with Denver's customs, practices, and training. Defendant Doe placed Roybal-Smith, a Level 1 maximum-security inmate who had just been arrested following a violent, drug-fueled rampage, into a single cell with Mr. Chacon, a Level 4 detainee held on a failure to appear for a non-violent charge.

37.     The risk that Roybal-Smith would harm Mr. Chacon was obvious. Despite this, none of the Individual Defendants intervened to ensure that Roybal-Smith was not housed with Mr. Chacon, nor did they do anything to protect Mr. Chacon from the danger posed to him by Roybal-Smith.

**Denver and the Defendant DSD deputies failed to perform required checks on Mr. Chacon at least every thirty-five minutes.**

38.     Denver requires its deputies to conduct welfare checks on the people in its custody no less than every thirty-five minutes. This is known within the DSD as the 35-Minute Well Being Rule.

39.     Denver's own rounds records for that night show that its deputies repeatedly violated the 35-Minute Well Being Rule. Compliance across the cells of the 2C unit hovered

between seventy and seventy-five percent, and the unit's medical kites went unchecked for more than two hours with a compliance rate of zero percent.

40.     Tellingly, Denver's rounds records for that night do not reflect a single welfare check on Mr. Chacon's own cell, 2C-102. DSD deputies logged checks on other cells in the unit. Mr. Chacon's cell does not appear at all.

**On the night of June 29 and 30, 2025, Denver and the Individual Defendants who were responsible for Mr. Chacon failed him.**[1]

41.     On the evening of June 29, 2025, Defendant Doe, the DSD deputy responsible for Roybal-Smith's housing assignment, placed Roybal-Smith, a dangerous Level 1 maximum-security inmate, into cell 2C-102 with Mr. Chacon, a Level 4 medium-security detainee. Mr. Chacon was alive, awake, and moving.

42.     Denver's records reflect rounds activity in the 2C unit logged under Defendant Morales's badge number from approximately 12:20 a.m. until approximately 2:12 a.m. However, Denver's own investigation determined that the deputy actually assigned to and on duty in the 2C pod that night (presumably Defendant Lukajic or Defendant Roe) did not update the electronic rounds tracker when he reported for his shift. As a result, it is unclear whether rounds logged as having been completed by Defendant Morales were actually performed by Defendant

---

[1] Many documents produced to Plaintiff's counsel pursuant to open records requests—including the investigative memo from Denver's Administrative Investigations Unit that provides much of the information relied upon for the allegations in this section of the Complaint—were heavily redacted, leaving counsel to guess the identities of the involved Denver Sheriff's Office personnel. Further, Plaintiffs' counsel requested records relating to Chacon's death approximately a year ago and only received these heavily redacted records a few days ago, despite consistent follow up. Denver's actions have impeded Plaintiffs' ability to seek justice and prevent Plaintiffs from naming every DSD official involved in Chacon's death despite the best efforts of Plaintiffs and Plaintiffs' counsel.

Morales, Defendant Lukajic, or Defendant Roe. The welfare checks logged that night were late and incomplete, and not one was recorded for Mr. Chacon's own cell, 2C-102.

43.    According to Denver's own investigation, the deputy on post (Defendant Morales, Defendant Lukajic, or Defendant Roe) made rounds at approximately 1:36 a.m. and again at approximately 2:09 a.m. looking into the window of the cells as he makes his rounds, and was seated at the deputy's desk at 2:16 a.m.

44.    Another report indicates that in response to a query by paramedics as to the last time Mr. Chacon had been seen awake and moving, Defendant Lukajic shared that he had done a round and did not see anything out of the ordinary.

45.    During this window, Mr. Chacon cried out for help. Another man held two cells down from Mr. Chacon in the 2C unit later filed a formal grievance reporting that he heard Mr. Chacon ask for a sergeant on the night of his death and then cry for help all night in his cell until he was finally choked to death while the DSD deputies did nothing.

46.    At approximately 2:17 a.m., only after Roybal-Smith banged on the cell window and reported that Mr. Chacon was choking, did Defendant Lukajic open the cell. Mr. Chacon was unresponsive. He was already dead.

47.    Defendant Kerbelis, as the sergeant responsible for supervising the 2C housing unit, failed in his pre-incident duties. He had no documented supervisory activity in the 2C pod during the critical overnight hours. He did not review, flag, or direct the correction of the dangerous housing pairing of a Level 1 maximum-security inmate (Roybal-Smith) with a Level 4 medium-security detainee (Mr. Chacon). He did not ensure that the 35-Minute Well Being Rule was being observed.

48.     Had Defendant Kerbelis performed his supervisory duties, either the dangerous housing assignment or the failure to conduct timely welfare checks, or both, would have been detected and corrected before Mr. Chacon was murdered.

49.     At approximately 2:18 a.m., Defendant Kerbelis responded to the cell and administered Narcan to the already-dead Mr. Chacon.

50.     Defendant Reynolds, who was also assigned to the 2C unit and responsible for its welfare checks, responded to the emergency. She then performed the unit's rounds and downloaded the rounds tracker.

51.     Defendant Laing, as the watch commander responsible for the Downtown Detention Center that night, failed in her pre-incident supervisory duties. No documentation reflects that Defendant Laing reviewed or approved the housing decision to place Roybal-Smith, a dangerous Level 1 maximum-security inmate, in a shared cell with Mr. Chacon. She did not ensure that her subordinate supervisors and deputies were conducting timely welfare checks or that the dangerous housing assignment was identified and corrected. Her failure to exercise meaningful supervisory oversight was a direct cause of Mr. Chacon's death.

52.     At approximately 2:55 a.m., Mr. Chacon was pronounced dead. Defendant Diggins, the Sheriff responsible for the policies, training, staffing, and supervision that failed Mr. Chacon, was called out and arrived at the jail in the pre-dawn hours.

**Roybal-Smith strangled Vincent Chacon to death.**

53.     Roybal-Smith strangled Vincent Chacon inside cell 2C-102. While speaking with investigators, Roybal-Smith became upset and stated, "I did it. You might as well kill me now."

54.     The Denver Office of the Medical Examiner determined that Mr. Chacon died of asphyxia due to external compression of the neck: strangulation. The medical examiner ruled the

manner of death a homicide and found that Mr. Chacon's injuries were most consistent with an assault by another person.

55.    Mr. Chacon suffered abrasions and contusions of the neck, jawline, and scalp, along with petechiae consistent with strangulation. Multiple DSD deputies who responded to the cell saw the red marks and dark bruising around Mr. Chacon's neck.

56.    Roybal-Smith later pled guilty to murdering Mr. Chacon.

**Denver and Defendant Gurlé tried to pass off Vincent Chacon's murder as a choking accident.**

57.    At 3:28 a.m. on June 30, 2025, more than an hour after Mr. Chacon was pronounced dead, and after responding officers had already documented visible strangulation bruising on his neck and jaw, Defendant Gurlé sent the official death-in-custody notification to Sheriff Diggins and other senior DSD officials. The notification described Mr. Chacon's death as a choking incident. It did not mention strangulation nor did it mention the bruising that multiple officers had already observed and documented. It did not mention that the Denver Police Homicide Unit had been contacted. The notification perpetuated the false narrative that Roybal-Smith had fabricated at the scene and set the tone for Denver's months-long campaign to characterize Mr. Chacon's murder as an accident.

58.    When deputies responded to the cell, they reported that Roybal-Smith had told them Mr. Chacon was choking on an apple. For months afterward, Denver told Mr. Chacon's family that his death might have been an accident.

59.    It was not an accident. Mr. Chacon was strangled to death, in Denver's custody, because Denver locked a maximum-security inmate in his cell and then failed to protect Mr. Chacon.

**Denver investigated itself and ratified the Individual Defendants conduct.**

60.     Denver's Administrative Investigations Unit ("AIU") reviewed Mr. Chacon's death and concluded that there was no policy violation by any of the Individual Defendants.

61.     The Individual Defendants placed a Level 1 maximum-security killer in a cell with a Level 4 non-violent detainee, failed to adequately perform and document mandatory rounds, ignored his cries for help, and allowed him to be strangled to death. Denver reviewed all of that evidence and concluded that no one had violated any policy. That conclusion is itself powerful evidence of Denver's deliberate indifference to the safety of those in its custody.

**Denver abjectly failed to train and supervise its deputies.**

62.     Denver failed to adequately train its deputies on how to classify inmates, how to make safe housing assignments, how to conduct timely welfare checks, and how to protect detainees from known risks of violence. The need for such training was obvious, and the consequences of failing to provide it were predictable.

63.     As described herein, Denver failed to adequately supervise its deputies, including on the night Mr. Chacon was killed, when its deputies disregarded the 35-Minute Well Being Rule, never checked on Mr. Chacon's cell at all, and failed even to log their rounds accurately. It also failed to ensure that its deputies were properly classifying inmates and not housing extremely dangerous inmates with non-violent and non-dangerous inmates.

**Vincent Chacon's death was the foreseeable product of Denver's entrenched custom, policy, and/or practice of deliberate indifference to those in its jails.**

64.     Vincent Chacon's death was not an isolated act by a few careless deputies. It was the predictable product of customs, policies, and practices that Denver has cultivated for many years. Through death after death, lawsuit after lawsuit, and audit after audit, Denver has known that the people locked in its jails are not safe. It has chosen not to protect them.

65.     On March 11, 2024, a deputy working at the DDC allowed inmates from different groups out of their cells at the same time, leaving their cell doors open. During that time, four inmates got access to the cell of another inmate and brutally assaulted him, causing serious injuries to his face, neck, and shoulders. During the investigation, the deputy denied having knowledge of or allowing the attack on the inmate to occur. But facility video showed the deputy observing the inmates gathering around the assaulted inmate's cell. Further, the deputy failed to conduct rounds for more than two hours that day. Approximately thirty-three minutes after the assault, when a captain entered the pod to complete a round, he walked past the assaulted inmate's cell but failed to notice that there were multiple inmates gathered in the cell, including some were not wearing appropriate uniforms. By failing to investigate the strange behaviors occurring within the assaulted inmate's cell, the captain failed to notice that the inmate had been injured and required medical attention.

66.     In July of 2014, Denver paid Jamal Hunter a $3.25 million settlement to resolve a case involving multiple instances of wrongdoing by Denver and DSD deputies. On July 18, 2011, Mr. Hunter was the victim of a fellow inmate's violent attack that was enabled by the complicity of Deputy Gaynel Rumer, who initially received a mere forty-day suspension. Part of Deputy Rumer's misconduct included failure to conduct proper rounds. Then, on July 31, 2011, Mr. Hunter was attacked and choked by Deputy Edward Keller. This incident was not reviewed, despite Mr. Hunter' filing a grievance about it. During the *Hunter* litigation, the Honorable Judge John L. Kane asked federal authorities in June 2014 to investigate the "patterns and practices" of the Denver police and sheriff's offices and suggested they were intimidating a key witness, saying that a Denver police investigation "smacks of a sham." Denver agreed as part of the *Hunter* settlement to conduct an external review of the DSD, which would consider classification

of inmates at the DDC for purposes of placement in pods and cells; the screening and hiring process for DSD deputies; best practices related to the discipline of DSD deputies; and best practices related to the functioning of DSD Internal Affairs Bureau ("IAB").

67. In February 9, 2022, 71-year-old Leroy Taylor died in the DDC after the jail's medical staff ignored his obvious and worsening symptoms, including chest pain, persistent vomiting and diarrhea, inability to swallow, and his visibly blue hands and feet. Deputies reported that Mr. Taylor was barely breathing, delirious, and needed other inmates' help to use the bathroom. He was returned to his cell again and again until he died.

68. In 2008, Denver paid $150,000 to Timothy Thomason, who was forced to spend hours in the DDC without his medication until he suffered a seizure, banging his head on the cement floor of his cell. Mr. Thomason was arrested on charges of cultivating marijuana. While being transported to jail, he informed the officers that he was suffering from terminal Stage IV non-Hodgkin lymphoma, and that he was taking significant amounts of pain killers and anxiety medication. The officers assured him that they would bring his medications to the jail. Once he arrived, however, his repeated pleas for medication were unjustifiably ignored.

69. In 2008, Denver and Denver Health paid a combined $7 million to the family of Emily Rae Rice, who died while in DSD's custody after deputies ignored her cries for help for hours. She was suffering internal bleeding caused by a lacerated spleen and liver. After her death, Denver engaged in investigations which minimized and covered up Denver's failure. Further, deputies involved in Ms. Rice's death lied to investigators without any discipline. Upon information and belief, one of the most culpable DSD Defendants, Faun Gomez, received no disciplinary action for her role, and went on to cause the death of Marvin Booker, as described below. Denver agreed as part of the *Rice* settlement to annually discuss her death at a roll call meeting and to install a system that tracks deputies to ensure they make their rounds, among other measures.

70.     In 2018, when one detainee reported that another had threatened to hang himself at the DDC, a DSD deputy responded that the suicidal man would have to ask for help on his own, and did nothing. Further, that deputy lied about receiving an alert about the suicidal treat, and faced no discipline for that lie.

71.     Deaths have mounted as a result of Denver's deliberate indifference. Denver recorded ten in-custody deaths in 2021, three in 2022, five in 2023, six in 2024, and at least nine in 2025. They continue unabated. Just this month, another man died in DSD's custody at DDC.

**Denver has a custom, policy, and/or practice of allowing the people in its custody to be brutalized and killed.**

72.     In 2010, DSD deputies killed Marvin Booker, a houseless street preacher, in the booking area of the DDC. The deputies put Mr. Booker in a carotid chokehold, pressed their weight on his back while he was handcuffed, and tased him, and then failed to provide him any medical care as he died. A federal jury found that the deputies used excessive force, failed to try to save his life, and acted with evil motive or intent, and it awarded his estate $4.65 million, at the time the largest civil rights verdict in Colorado history. The Tenth Circuit affirmed the denial of qualified immunity. The Denver medical examiner ruled Mr. Booker's death a homicide. Denver disciplined no one.

73.     In 2012, DSD deputy Brady Lovingier grabbed Anthony Waller, a pretrial detainee who was handcuffed and shackled and quietly addressing the judge at his own advisement hearing, and slammed his head into a glass wall. The unprovoked assault was captured on the courtroom video. A jury found that Deputy Lovingier used excessive force.

74.     In 2015, DSD deputies killed Michael Marshall, restraining him face-down during a mental health crisis until he aspirated his own vomit and asphyxiated. Denver paid his family approximately $4.65 million.

75.     In 2019, DSD deputy Jason Gentempo punched Serafin Finn, a man who used a wheelchair, flipped him out of it, and smashed his head into the ground. Denver reviewed the beating and concluded that Deputy Gentempo had done nothing wrong. Denver later paid $325,000 to settle Mr. Finn's case. Deputy Gentempo remained on the force, and he was arrested for assaulting another person years later. A Denver official tried to cover up the assault.

**Demonstrating its deliberate indifference to detainee welfare and safety, Denver has been aware of failures in its inmate classification, intake, safety, and housing procedures for over a decade but has refused to fix them.**

76.     As early as 2013, Denver's own Office of the Independent Monitor ("OIM") reported that the DSD was not even investigating all allegations of prisoner abuse, as the law required.

77.     In 2015, an independent assessment of DSD commissioned by Denver found problems at almost every level, including a near-total lack of accountability when deputies used force against the people in their custody. The assessment made fourteen key findings and 277 recommendations, twenty-seven of which addressed inmate classification, intake, and safety.

78.     In January 2018, the Denver Auditor assessed the DSD's progress in implementing those classification, intake, and safety reforms. The Auditor explained that inmate classification serves two purposes that flow directly from the Department's own mission to provide safe and secure custody for those placed in our care: first, making suitable housing decisions, and second, providing important information about the offenders to the deputies who are tending to the inmates on a daily basis. The Auditor found Denver's system deficient at both purposes. The Auditor found that DSD's Jail Management System overwrites old information with new information and does not have the capacity to store or date the old information, so an inmate's history could be lost. And, when a deputy recorded whether an inmate had a history of

assaultive felony convictions, the deputy could enter only a "yes" or a "no" without any way to document information such as past acts or criminal proceedings which informed that entry.

79.     Denver continues to fail to address these issues that put detainees in its custody at risk. The OIM's 2025 Semi-Annual Report found that DSD's own internal investigations were so inadequate that the OIM returned 56.2 percent of them for additional work. In other words: when DSD is charged with investigating whether its own deputies violated policy, more than half the time even Denver's designated watchdog cannot accept the result.

80.     Denver's response to so many in-custody deaths and an accountability system that fails more than half the time has been to reduce oversight rather than strengthen it. In May 2026, the Denver approved a new DSD directive that removed formal investigations and AIU review for certain categories of deputy misconduct. Under that directive, some policy violations would be handled informally by supervisors, cutting the AIU out of the process entirely. Independent Monitor Lisabeth Pérez Castle responded publicly: the directive was eliminating transparency and accountability. The OIM and Denver's civilian oversight board called for the directive's immediate rescission. Denver has not rescinded it.

81.     Denver's own independent watchdog is now being sidelined. The Independent Monitor has stated publicly that the departments are attempting to limit or completely eliminate her office's role in the oversight process. The agency that is supposed to check Denver's conduct is being bypassed. This has resulted in more deaths, less accountability, and less oversight. Denver is not learning from its failures and, instead, is trying to hide them.

**When its deputies harm the people in its custody, Denver protects its deputies.**

82.     Denver's response to this violence has been to protect the deputies who inflict it. Denver disciplined no one for killing Marvin Booker. It cleared Jason Gentempo of any

wrongdoing for beating Serafin Finn. It suspended the deputies who facilitated Jamal Hunter's torture for a matter of weeks and then, as a federal judge found, tried to bury the investigation.

83.    When Mr. Chacon was strangled to death in a cell Denver never should have placed him in, Denver's AIU concluded that there was no indication of any policy violation.

84.    By refusing to hold its deputies accountable, Denver has ratified their conduct and told its workforce that failing to protect the people in its custody carries no consequence.

**Denver's customs, policies, and/or practices were the moving force behind Vincent Chacon's death.**

85.    Denver's customs, policies, and practices, and its deliberate indifference to the obvious dangers they created, were the moving force behind the violation of Mr. Chacon's constitutional rights and his death.

86.    Had Denver classified and housed the people in its jail safely, conducted timely welfare checks, trained and supervised its deputies, and held accountable those who endangered the people in its custody, Vincent Chacon would be alive today.

**STATEMENT OF CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Failure to Protect**
*Plaintiff Estate of Vincent Chacon Against All Defendants*

87.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

88.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

89.    Defendants are "persons" under 42 U.S.C. § 1983.

90.    At all times relevant to this Complaint, Vincent Chacon was a pretrial detainee whose rights were protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

91.    Each of these Defendants knew of and disregarded an excessive risk to Mr. Chacon's safety.

92.    Defendant Doe created and disregarded that risk by placing Roybal-Smith, a dangerous Level 1 maximum-security inmate, into cell 2C-102 with Mr. Chacon, a Level 4 medium-security detainee, a dangerous pairing that each Defendant should have flagged and prevented based on Denver's own classification system.

93.    Defendants Morales, Lukajic, and/or Roe, the deputies on post, disregarded that risk by failing to conduct timely welfare checks, by passing Mr. Chacon's cell without intervening, and by failing to respond to Mr. Chacon's cries for help. Defendant Reynolds, who was also assigned to the unit and responsible for its welfare checks, disregarded that risk by failing to ensure that timely welfare checks were conducted.

94.    Defendant Gurlé created and disregarded that risk by perpetuating a false narrative about the cause of Mr. Chacon's death in the official death-in-custody notification he sent to the Sheriff and senior DSD leadership. His characterization of a strangulation homicide as a choking accident, after responding officers had documented the bruising, reflects deliberate indifference to Mr. Chacon's rights and contributed to the institutional cover-up that has impeded accountability for Mr. Chacon's death.

95.    Defendants Diggins, Laing, and Kerbelis are liable as supervisors. They personally participated in, set in motion, knew of and acquiesced in, and were deliberately indifferent to the policies, customs, and practices that caused Mr. Chacon's death, including the

failure to safely classify and house inmates, the failure to conduct timely welfare checks, and the failure to train, supervise, and discipline subordinate deputies regarding each of these duties.

96.     As detailed above, Defendant Kerbelis failed to identify or correct the dangerous housing pairing, failed to ensure rounds compliance, and conducted no documented supervisory oversight of the 2C pod before Mr. Chacon was killed.

97.     Defendant Laing likewise failed to review or correct the housing decision and failed to ensure that her subordinates were performing timely welfare checks.

98.     Defendants knew or should have known that jail officials have a duty to protect the people in their custody from violence at the hands of other inmates.

99.     Defendants knew or should have known that a pretrial detainee is entitled to at least the same protection under the Fourteenth Amendment as a convicted prisoner receives under the Eighth Amendment.

100.    Defendants knew or should have known that an official violates that duty when the official knows of and disregards an excessive risk to a detainee's health or safety.

101.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

102.    Their pre-incident failures were not mere negligence. They reflected the same systemic deliberate indifference to inmate safety that Denver has tolerated for years.

103.    Denver maintained customs, policies, and practices of deliberate indifference to the safety of the people in its custody, including: housing dangerous, high-security inmates with vulnerable, low-security detainees; failing to conduct timely welfare checks; failing to protect detainees from known risks of inmate-on-inmate violence; and failing to train, supervise, and discipline its deputies regarding these dangers.

104.    Denver was deliberately indifferent to the obvious risks created by these customs and practices. Through prior in-custody deaths and assaults, the resulting litigation and settlements, an independent assessment of the DSD, and the Denver Auditor's findings, Denver had actual and constructive notice that its practices endangered the lives of the people in its custody. Denver was deliberately indifferent in its failure to act to rectify these obvious problems.

105.    Denver further ratified the unconstitutional conduct of its deputies by reviewing Mr. Chacon's death and concluding that no policy had been violated.

106.    Denver's customs, policies, and practices were the moving force behind the violation of Mr. Chacon's constitutional rights and his death.

107.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

108.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Mr. Chacon suffered, and other compensatory and special damages.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Unconstitutional Conditions of Confinement**
*Plaintiff Estate of Vincent Chacon Against All Defendants*

109.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

110.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

111.    Defendants are "persons" under 42 U.S.C. § 1983.

112.    At all times relevant to this Complaint, Mr. Chacon was a pretrial detainee whose rights were protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

113.    At all times relevant to this Complaint, Mr. Chacon was a pretrial detainee. He had not been convicted of any crime, and the Due Process Clause of the Fourteenth Amendment forbade Defendants from subjecting him to any condition of confinement that amounted to punishment.

114.    The Fourteenth Amendment required Defendants to provide Mr. Chacon humane conditions of confinement, including reasonable protection of his personal safety, and forbade Defendants from subjecting him to conditions that deprived him of the minimal civilized measure of life's necessities or that posed a substantial risk of serious harm.

115.    A pretrial detainee's claim of unconstitutional conditions of confinement arises under the Fourteenth Amendment and is analyzed under the same deliberate-indifference standard that governs an Eighth Amendment conditions claim by a convicted prisoner.

116.    Defendants subjected Mr. Chacon to unconstitutional conditions of confinement. Those conditions included housing a Level 1 maximum-security inmate, who had just been arrested following a double homicide and a violent, drug-fueled rampage, in the same cell as Mr. Chacon, a Level 4 detainee held on a traffic charge; the chronic understaffing of the jail; the systemic failure to conduct the welfare checks required by Denver's own 35-Minute Well Being

Rule, including the complete failure to check on Mr. Chacon's cell at all; and the failure to monitor, supervise, and protect the people in Denver's custody. Separately and in combination, these conditions deprived Mr. Chacon of his basic right to personal safety and posed a substantial risk of serious harm to him.

117.    Each of the Defendants knew of and disregarded the substantial risk of serious harm that these conditions posed to Mr. Chacon. The risk was obvious.

118.    Denver created and maintained these unconstitutional conditions of confinement as a matter of custom, policy, and practice, and was deliberately indifferent to the substantial risk of serious harm they posed, as set forth above. Denver's customs, policies, and practices were the moving force behind the violation of Mr. Chacon's constitutional rights.

119.    The conditions to which Defendants subjected Mr. Chacon were not reasonably related to any legitimate governmental objective, were excessive, and amounted to the unconstitutional punishment of a pretrial detainee.

120.    Defendants knew or should have known that jail officials have a duty to provide safe conditions of confinement to inmates.

121.    Denver maintained customs, policies, and practices of deliberate indifference to the safety of the people in its custody, including: housing dangerous, high-security inmates with vulnerable, low-security detainees; failing to conduct timely welfare checks; failing to protect detainees from known risks of inmate-on-inmate violence; and failing to train, supervise, and discipline its deputies regarding these dangers.

122.    Denver was deliberately indifferent to the obvious risks created by these customs and practices. Through prior in-custody deaths and assaults, the resulting litigation and settlements, an independent assessment of the DSD, and the Denver Auditor's findings, Denver

had actual and constructive notice that its practices endangered the lives of the people in its custody. Denver was deliberately indifferent in its failure to act to rectify these obvious problems.

123.    Denver further ratified the unconstitutional conduct of its deputies by reviewing Mr. Chacon's death and concluding that no policy had been violated.

124.    Denver's customs, policies, and practices were the moving force behind the violation of Mr. Chacon's constitutional rights and his death.

125.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

126.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after his arrest, and other compensatory and special damages.

**THIRD CLAIM FOR RELIEF**[2]
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Secs. 20 and 25**
**Failure to Protect**
*Plaintiffs Against Individual Defendants*

127.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

128.    C.R.S. § 13-21-131 creates a cause of action against a peace officer, as defined in C.R.S. § 24-31-901(3), who, under color of law, subjects or causes any person to be subjected, including by failing to intervene, to a deprivation of individual rights secured by the bill of

---

[2] Plaintiffs bring this claim in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

rights, article II of the Colorado Constitution. Qualified immunity is not a defense to such a claim.

129.    Article II, Section 25 of the Colorado Constitution guarantees that no person shall be deprived of life or liberty without due process of law, and Article II, Section 20 prohibits cruel and unusual punishments. Together, these provisions required the Individual Defendants to protect Mr. Chacon, a pretrial detainee in their custody, from a known and obvious risk of serious harm.

130.    Each of the Individual Defendants is a peace officer within the meaning of C.R.S. § 24-31-901(3).

131.    Acting under color of law, each Defendant subjected or caused Mr. Chacon to be subjected to a deprivation of his rights under Article II, Sections 20 and 25 of the Colorado Constitution.

132.    Defendant Doe subjected Mr. Chacon to that deprivation by placing him in a cell with a maximum-security inmate who posed an obvious danger.

133.    Defendants Morales, Lukajic, Roe, and Reynolds subjected Mr. Chacon to that deprivation by failing to conduct timely welfare checks and by failing to respond to his cries for help.

134.    Defendants Diggins, Laing, and Kerbelis subjected Mr. Chacon to that deprivation by failing to supervise their subordinates' housing decisions and welfare check obligations, thereby failing to protect him from being strangled to death.

135.    Defendant Gurlé subjected Mr. Chacon to a deprivation of his rights under Article II, Sections 20 and 25 of the Colorado Constitution by perpetuating a false characterization of

Mr. Chacon's death, thereby facilitating a cover-up that has denied Mr. Chacon's family the accountability and transparency to which they are entitled under Colorado law.

136.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

137.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered, and other compensatory and special damages.

**FOURTH CLAIM FOR RELIEF**[3]
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Secs. 20 and 25**
**Unconstitutional Conditions of Confinement**
*Plaintiffs Against Individual Defendants*

138.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

139.    C.R.S. § 13-21-131 creates a cause of action against a peace officer, as defined in C.R.S. § 24-31-901(3), who, under color of law, subjects or causes any person to be subjected, including by failing to intervene, to a deprivation of individual rights secured by the bill of rights, article II of the Colorado Constitution.

140.    Article II, Section 20 of the Colorado Constitution prohibits cruel and unusual punishments, and Article II, Section 25 guarantees that no person shall be deprived of life or liberty without due process of law. Together, these provisions forbade the Individual Defendants

---

[3] Plaintiffs bring this claim in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

from subjecting Mr. Chacon, a pretrial detainee in their custody, to conditions of confinement that amounted to punishment or that posed a substantial risk of serious harm to his safety.

141.    Each of the Individual Defendants is a peace officer within the meaning of C.R.S. § 24-31-901(3). Acting under color of law, each subjected Mr. Chacon to unconstitutional conditions of confinement, including housing him with a maximum-security inmate who posed an obvious danger, the failure to conduct the welfare checks required by Denver's own policy, the failure to monitor and protect him, and the chronic understaffing and supervisory failures described above.

142.    These conditions deprived Mr. Chacon of his basic right to personal safety, posed a substantial risk of serious harm to him, and amounted to the unconstitutional punishment of a pretrial detainee in violation of Article II, Sections 20 and 25 of the Colorado Constitution.

143.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

144.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered, and other compensatory and special damages.

**FIFTH CLAIM FOR RELIEF**
**Negligence and Negligent Operation of a Correctional Facility**
**Negligent Classification, Supervision, Training, Hiring, and Retention**
*Plaintiff Angela Hernandez Against Defendants Denver, Doe, Morales, Roe, Lukajic, Reynolds, Laing, and Kerbelis*

145.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

146.    Because Mr. Chacon was in the custody of the DSD and wholly dependent on Defendants for his safety, Defendants owed Mr. Chacon a duty to exercise reasonable care to protect him from harm, including harm at the hands of other inmates.

147.    Defendants breached that duty.

148.    Defendant Doe negligently classified and housed Mr. Chacon with a maximum-security inmate who posed an obvious danger to him.

149.    Defendants Morales, Roe, Lukajic, and Reynolds negligently failed to conduct timely welfare checks and negligently failed to respond to his cries for help.

150.    Defendants Diggins, Laing, and Kerbelis negligently supervised their subordinate deputies, negligently failed to ensure safe housing decisions were made, and negligently failed to ensure that the 35-Minute Well Being Rule was observed.

151.    Denver further negligently operated the Downtown Detention Center and negligently supervised, trained, hired, and retained the deputies responsible for Mr. Chacon's safety.

152.    Defendant Gurlé independently breached that duty by negligently and falsely characterizing Mr. Chacon's death as an accidental choking in the official death-in-custody notification, notwithstanding that he knew or should have known, from the information available to him at 3:28 a.m., that responding officers had documented strangulation bruising and that the Denver Police Homicide Unit had been called. This negligent misrepresentation harmed Ms. Hernandez and other members of Mr. Chacon's family and impeded the investigation and accountability process.

153.    Defendant City and County of Denver's sovereign immunity is waived under the Colorado Governmental Immunity Act because Plaintiffs' injuries arise from the operation of a

correctional facility and jail. C.R.S. § 24-10-106(1)(b). Because Mr. Chacon was a pretrial detainee who had not been convicted of a crime, the exclusion in C.R.S. § 24-10-106(1.5)(a) for claimants convicted and incarcerated pursuant to such conviction does not apply.

154. The conduct of Defendants Doe, Morales, Roe, Lukajic, Reynolds, Laing, and Kerbelis was willful and wanton, as described herein. Their immunity under the Colorado Governmental Immunity Act is therefore waived pursuant to C.R.S. § 24-10-118.

155. As a direct and proximate cause and consequence of Defendants' negligent acts and omissions, described above, Plaintiffs suffered damages, injuries, and losses as set forth herein, and other compensatory and special damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against each Defendant, and award all relief allowed by law and equity, including but not limited to the following:

a. Declaratory relief;

b. Actual economic damages as established at trial;

c. Compensatory damages, including for past and future pecuniary and non-pecuniary losses, physical and mental pain and suffering, fear, terror, loss of enjoyment of life, loss of liberty, and the wrongful death of Mr. Chacon;

d. Survival and wrongful death damages as permitted by law;

e. Punitive and exemplary damages in an amount to be determined at trial;

f. Equitable and injunctive relief, including but not limited to:

1. Policy changes designed to prevent future similar misconduct; and

2. Mandatory training designed to prevent future similar misconduct;

g.  Pre-judgment and post-judgment interest at the highest lawful rate;

h.  Attorney fees and costs pursuant to 42 U.S.C. § 1988, C.R.S. § 13-21-131, and all other

applicable law; and

i.  Such further relief as justice requires.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 28th day of June, 2026.

NEWMAN | MCNULTY, LLC

*s/ Mari Newman*
Mari Newman
Andy McNulty
Madeline Leibin
1490 N. Lafayette Street, Suite 304
Denver, CO 80218
(720) 850-5770
mari@newman-mcnulty.com
andy@newman-mcnulty.com
madeline@newman-mcnulty.com

ATTORNEYS FOR PLAINTIFFS