**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-02901-GPG-TPO

ESTATE OF VINCENT CHACON, by and through its personal representative Angela Hernandez, and
ANGELA HERNANDEZ,

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, COLORADO;
ELIAS DIGGINS, in his individual and official capacities;
STEPHANIE LAING, in her individual and official capacities;
LINAS KERBELIS, in his individual and official capacities;
DENISE CORDOVA, in her individual and official capacities;
SERGIO MORALES, in his individual and official capacities;
DARKO LUKAJIC, in his individual and official capacities;
JOSÉ GURULÉ, JR., in his individual and official capacities;
MEGAN CLARK, in her individual and official capacities; and
ANDREA WEBBER, in her individual and official capacities,

Defendants.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiffs, by and through their attorneys, Mari Newman, Andy McNulty, and Madeline Leibin of NEWMAN | MCNULTY, LLC, allege for their First Amended Complaint and Jury Demand as follows:

## INTRODUCTION

1. Vincent Chacon was a non-violent man booked into the Denver jail for a minor offense. Instead of going home to his friends and family, Mr. Chacon left the Denver jail as a corpse. He was murdered because City and County of Denver ("Denver") Sheriff Department ("DSD") deputies placed an extremely violent and dangerous man, high on methamphetamine,

into his cell without bothering to assess whether that man was dangerous, and then ignored Mr. Chacon's cries for help as his meth-addled cellmate strangled him to death. Not only were Denver's actions negligent, they were callous and deliberately indifferent. They violated Mr. Chacon's constitutional rights.

2. Defendants locked Ricky Roybal-Smith, a repeat offender with a long rap sheet, into Mr. Chacon's cell. He arrived at the Denver jail after having murdered two people, and only hours after a drug-fueled hit-and-run. He was a violent career criminal. Denver never assessed his dangerousness and criminal history. And when he refused to answer a single one of Denver's screening questions, Denver locked him in Mr. Chacon's cell anyway.

3. In contrast, Mr. Chacon had no history of violent crime and was being held on a minor offense. He was classified as a Level 4, medium-security inmate.

4. Denver's own classification system is supposedly designed to separate detainees so that violent criminals like Roybal-Smith do not victimize non-dangerous detainees like Mr. Chacon. But, in practice, Denver consciously allows its deputies to ignore the classification system and lock potentially dangerous newly arrested men into shared cells before it classifies them at all, and before it checks their criminal histories, as a matter of standard DSD policy. And, it allows its deputies to fail to monitor the detainees that they place into harm's way.

5. Less than two hours after Denver locked Roybal-Smith into Mr. Chacon's cell, Roybal-Smith strangled Mr. Chacon to death. For a full hour before his death, DSD officials ignored Mr. Chacon's cries for help.

6. When DSD officials finally opened the cell, they tried to pass Mr. Chacon's death off as an accident, claiming he had choked on an apple, despite obvious signs of strangulation.

He had not. The Denver Office of the Medical Examiner determined that Mr. Chacon died of asphyxia due to external compression of the neck, and ruled the manner of death a homicide.

7. Denver's coverup did not stop there. Two days after its own police arrested Roybal-Smith for murder, a representative of Denver's Office of the Medical Examiner told Mr. Chacon's mother that her son had choked on an apple. Then, for nearly a year, Denver (through Records Administrator Andrea Webber) stonewalled the family's requests for the records and video of his death, refused to release the body-worn camera footage that Colorado law required it to release within twenty-one days, and redacted the names of the deputies responsible. By the time this Court ordered Denver to identify those deputies, more than fifteen months after Mr. Chacon's death, Denver was already arguing that Mr. Chacon's estate could not sue them because the statute of limitations had run.

8. Mr. Chacon's death was no aberration. Denver has known for years that its jail is dangerous, that its deputies fail to protect the people in their custody, and that its classification and supervision systems are broken. Denver was warned again and again, but chose to take no action to improve inmate safety. Mr. Chacon paid for Denver's deliberate indifference with his life.

9. Mr. Chacon's mother, Angela Hernandez, brings this case to ensure that being held as a detainee by the DSD is not a death sentence.

## PARTIES

10. The decedent, Mr. Chacon, was, at all times relevant to this Complaint, a pretrial detainee in the custody of the DSD at the Downtown Detention Center ("DDC"). He was a citizen of the United States and a resident of Colorado.

11. Plaintiff Angela Hernandez is the mother of Mr. Chacon and the personal representative of his Estate. She brings these claims individually and on behalf of the Estate of Mr. Chacon. At all times relevant to this Complaint, Ms. Hernandez was a citizen of the United States and a resident of Colorado.

12. Defendant Denver is a municipal corporation organized under the laws of the State of Colorado. Denver operates the DSD and the DDC. Denver is a person subject to suit under 42 U.S.C. § 1983 and is responsible for the policies, customs, training, supervision, and discipline of the DSD and its deputies.

13. Defendant Elias Diggins is the Sheriff of Denver. He is the final policymaker for the DSD and is responsible for its policies, customs, training, supervision, and discipline. He is sued in his individual and official capacities. At all times relevant to this Complaint, Defendant Diggins acted within the scope of his official duties and employment and under color of state law.

14. Defendant Captain Stephanie Laing (badge number S14011) was, at all times relevant to this Complaint, a captain employed by the DSD and the watch commander on duty, responsible for supervising the deputies and operations of the DDC. She is sued in her individual and official capacities. At all times relevant to this Complaint, Defendant Laing acted within the scope of her official duties and employment and under color of state law.

15. Defendant Sergeant Linas Kerbelis (badge number S14046) was, at all times relevant to this Complaint, a sergeant employed by the DSD and responsible for supervising the second and third floors of the DDC, including the 2C housing unit. He is sued in his individual and official capacities. At all times relevant to this Complaint, Defendant Kerbelis acted within the scope of his official duties and employment and under color of state law.

16. Defendant Denise Cordova (badge number S17097) was, at all times relevant to this Complaint, a deputy employed by the DSD and assigned to the DSD's classification unit at the DDC. On the night of June 29, 2025, and the early morning of June 30, 2025, Defendant Cordova processed Ricky Roybal-Smith's intake, administered his housing questionnaire, assigned him to cell 2C-102 with Mr. Chacon, and transferred him to the 2C housing unit. She is sued in her individual and official capacities. At all times relevant to this Complaint, Defendant Cordova acted within the scope of her official duties and employment and under color of state law.

17. Defendant Sergio Morales (badge number S24080) was, at all times relevant to this Complaint, a deputy employed by the DSD. On the night of June 29, 2025, until he left the unit at approximately 1:54 a.m. on June 30, 2025, Defendant Morales was the deputy assigned to the 2C housing unit. He received Roybal-Smith into the 2C unit and locked him into cell 2C-102 with Mr. Chacon. He is sued in his individual and official capacities. At all times relevant to this Complaint, Defendant Morales acted within the scope of his official duties and employment and under color of state law.

18. Defendant Darko Lukajic (badge number S17056) was, at all times relevant to this Complaint, a deputy employed by the DSD and assigned to the 2C housing unit where Mr. Chacon was held. Defendant Lukajic relieved Defendant Morales at approximately 1:54 a.m. on June 30, 2025, and was the only deputy assigned to the 2C unit when Mr. Chacon was found dead. He is sued in his individual and official capacities. At all times relevant to this Complaint, Defendant Lukajic acted within the scope of his official duties and employment and under color of state law.

19. Defendants Diggins, Laing, Kerbelis, Cordova, Morales, and Lukajic are referred to collectively as the "Individual Defendants."

20. Defendant José Gurulé, Jr. (Major, Operations Division) was, at all times relevant to this Complaint, a major employed by the DSD and assigned to the Operations Division. On the morning of June 30, 2025, Defendant Gurulé sent the official death-in-custody notification to Sheriff Diggins and other senior DSD officials characterizing Mr. Chacon's death as a choking accident, notwithstanding that responding deputies had already documented visible strangulation bruising around Mr. Chacon's neck. He is sued in his individual and official capacities. At all times relevant to this Complaint, Defendant Gurulé acted within the scope of his official duties and employment and under color of state law.

21. Defendant Megan Clark was, at all times relevant to this Complaint, a representative of Denver's Office of the Medical Examiner. On July 2, 2025, Defendant Clark called Ms. Hernandez and told her that the medical examiner had found a large piece of apple lodged in her son's trachea and that he had died from choking. Defendant Clark conveyed this information knowing that was false or with reckless indifference to the truth or falsity of her statement. Nothing was lodged in Mr. Chacon's airway. The only apple the medical examiner found inside his body was a fragment in his chest cavity, the origin of which the medical examiner later described as "unclear." She is sued in her individual and official capacities. At all times relevant to this Complaint, Defendant Clark acted within the scope of her official duties and employment and under color of state law.

22. Defendant Andrea Webber is the Records Administrator for the Office of the Executive Director of Denver's Department of Public Safety. At all times relevant to this Complaint, Defendant Webber was the records custodian who decided, on Denver's behalf,

whether and how to respond to Plaintiffs' requests for the records and recordings of Mr. Chacon's death held by the DSD, the Department of Public Safety, and the Denver Police Department ("DPD"). She is sued in her individual and official capacities. At all times relevant to this Complaint, Defendant Webber acted within the scope of her official duties and employment and under color of state law.

## JURISDICTION AND VENUE

23. This action arises under the Constitution and laws of the United States and the State of Colorado. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

24. Jurisdiction supporting Plaintiffs' claims for attorney fees and costs is conferred by 42 U.S.C. § 1988.

25. This Court has supplemental jurisdiction over Plaintiffs' claims arising under Colorado law pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

26. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

## FACTUAL ALLEGATIONS

### Vincent Chacon was a beloved son, brother, and friend being held on a minor offense.

27. To the DSD, Vincent Chacon was inmate number 785192. To Angela Hernandez, he was her son, a brother to his siblings, and a devoted friend.

28. On or about June 26, 2025, Mr. Chacon was booked into the DDC on a failure to appear warrant issued by the Lone Tree Police Department for alleged shoplifting, with bail set

at just $750. He had not been convicted of any crime. He was a pretrial detainee, and he was working through the court system to secure his release.

29. On June 26, 2025, Mr. Chacon answered every question on Denver's Housing Assessment Questionnaire. DSD Deputy Michael Hada assigned Mr. Chacon to the lower bunk of cell 2C-102 in the 2C housing unit of the DDC.

30. On June 29, 2025, Denver classified Mr. Chacon as a Level 4, medium-security inmate. He posed no danger to anyone.

**Ricky Roybal-Smith is a violent career criminal who had just killed two men and was arrested during a drug-addled crime spree.**

31. Ricky Roybal-Smith is a repeat violent offender with a criminal record stretching back more than fifteen years. Before he was booked into the DDC, he had been on parole five separate times since 2011 and had reoffended each time. His prior convictions included assault, a 2015 vehicular assault, and a 2022 weapons offense. Denver, and its officials including Defendant Cordova, knew that Roybal-Smith had been booked into Denver's jails in 2012 and because Denver released him from its custody to the Colorado Department of Corrections, they knew his Department of Corrections number and had the ability to access his criminal history.

32. In the early morning hours of June 29, 2025, Roybal-Smith stabbed two men to death in two separate attacks. His victims, Jesse Shafer and Scott Davenport, were each stabbed multiple times and were killed within about an hour of one another.

33. Later that same day, at approximately 2:40 p.m., Roybal-Smith struck two pedestrians in a hit-and-run. Police found him after another crash, with a syringe partially filled with suspected narcotics, methamphetamine, beside him. He was arrested at 2:47 p.m. for driving under the influence of drugs (his second such offense), careless driving resulting in injury,

leaving the scene of an accident involving injury, and failing to report an accident, and he was brought to the DDC.

34. Roybal-Smith was booked into the DDC at 7:27 p.m. on June 29, 2025. Three minutes later, Denver sent him to Denver Health Medical Center. He did not return to the jail until 10:34 p.m.

35. On information and belief, when Roybal-Smith was brought to the DDC, he was under the influence of methamphetamine, and Denver and the Individual Defendants knew that Roybal-Smith was high.

**Defendant Cordova locked an uncooperative killer in the same cell as a Level 4 non-violent detainee without conducting an assessment of his dangerousness.**

36. Defendant Cordova did not classify Roybal-Smith before it housed him. Denver admits that Roybal-Smith was an unclassified inmate when it put him in Mr. Chacon's cell. Defendant Cordova did not check Roybal-Smith's criminal history before it housed him, either. Defendant Cordova housed Roybal-Smith before anyone conducted background checks to determine his criminal record. This action was taken per standard DSD policy.

37. After Roybal-Smith returned from the hospital, he was held in the intake area until approximately 11:47 p.m., when Defendant Cordova moved him to an intake holding cell and processed him. Defendant Cordova administered Denver's Housing Assessment Questionnaire. Roybal-Smith refused to answer every one of its eighteen questions, including whether he had previously been incarcerated, whether he had ever sexually abused anyone either in or out of custody, whether he could name any inmates with whom he should not be placed, whether he was on probation or parole, and whether he had ever been associated with a gang. Defendant Cordova checked the box marked "Refuse All" and marked Roybal-Smith as "Non-

cooperative." Roybal-Smith did not sign the form and Defendant Cordova did not write "refused" in place of his signature, as required by Denver policy.

38. Defendant Cordova, pursuant to the customs and practices within the DSD, ignored Denver's written policies. Denver's intake classification post order required the intake classification deputy, before even calling an inmate to the desk, to review the inmate's current criminal charges, incident reports, separations, any medical or mental health recommendation for classification, and past codes and alerts. It requires the deputy to interview the inmate face to face and to complete the intake pre-classification questionnaire and the JMS proxy questions. It requires a search of the inmate's prior alerts prior to classifying an inmate. And it lists vehicular assault among the assaultive felonies classification deputies must consider.

39. Defendant Cordova did not conduct a background check on Roybal-Smith, and she did not classify him. No supervisor reviewed what she did. Denver did not record a proxy score for Roybal-Smith until July 1, 2025, the day after he killed Mr. Chacon. And the first warrant check Denver ran on Roybal-Smith came at 9:02 a.m. on June 30, 2025, nearly seven hours after Mr. Chacon was found unresponsive. Eight minutes later, Denver placed a parole hold on him.

40. Instead, Defendant Cordova assigned Roybal-Smith to cell 2C-102, the cell Mr. Chacon had occupied since June 26, and at 12:06 a.m. on June 30, 2025, she transferred Roybal-Smith to the 2C unit.

41. At 12:18 a.m., Defendant Morales received Roybal-Smith into the 2C unit and locked him into cell 2C-102 with Mr. Chacon. Defendant Morales wrote that he placed Roybal-Smith in the cell with Mr. Chacon because he was the same race and similar age to Mr. Chacon.

42. Denver's classification system supposedly exists to identify dangerous inmates and to keep them separated from the vulnerable, non-violent people in its custody. A Level 4 inmate held on a failure to appear for a non-violent charge sits near the bottom of that danger scale. An unclassified detainee who has just been arrested for a drug-fueled hit-and-run that injured two people, who was sent to the hospital minutes after booking, and who refuses to answer a single screening question, is exactly the person that system exists to screen before he is locked in a cell with someone else.

43. Denver and the Individual Defendants did the opposite in accordance with Denver's customs, practices, policies, and training. Defendant Cordova placed Roybal-Smith, an unclassified, unscreened, uncooperative, and high arrestee who had just been arrested following a violent, drug-fueled rampage, into a single cell with Mr. Chacon, a Level 4 detainee held on a failure to appear for a non-violent charge. Defendant Morales locked him in that cell because he was the same race and a similar age to Mr. Chacon.

44. The risk that Roybal-Smith would harm Mr. Chacon was obvious. Despite this, none of the Individual Defendants intervened to ensure that Roybal-Smith was not housed with Mr. Chacon, nor did they do anything to protect Mr. Chacon from the danger posed to him by Roybal-Smith.

**<u>Denver's rounds system never required any deputy to check on Mr. Chacon.</u>**

45. Denver requires its deputies to conduct welfare checks on the people in its custody no less than every thirty-five minutes. This is known within the DSD as the 35-Minute Well Being Rule.

46. Denver's own rounds records show that its deputies repeatedly violated the 35-Minute Well Being Rule. On June 29, 2025, the day before Mr. Chacon was killed, deputies

exceeded the thirty-five-minute limit fifty-six times across the eight rounds stations in the 2C unit, including gaps of more than an hour around midday. And for fifty-five minutes, from approximately 11:25 p.m. on June 29 until 12:20 a.m. on June 30, no deputy logged a check at any station in the 2C unit, even though a note entered under Defendant Morales's name at 11:59 p.m. claimed that Deputy Reynolds had completed a round.

47. Tellingly, Denver's rounds system does not require any deputy to check on any particular cell. Deputies touch a token to readers mounted at fixed locations in the unit. There was no reader for Mr. Chacon's cell, 2C-102. Nothing in Denver's system required, or recorded, that a deputy ever looked into Mr. Chacon's cell.

48. Once they were locked in for the night, the men in the 2C unit had no tablets and no access to the box where they could submit a medical kite. After lockdown, and during the time that Mr. Chacon was murdered, it was physically impossible for anyone in Unit 2C to put a medical kite in the box.

**On the night of June 29 and 30, 2025, Denver and the Individual Defendants who were responsible for Mr. Chacon failed him.**

49. When Defendant Morales locked Roybal-Smith in with him, Mr. Chacon was alive, awake, and moving. Defendant Morales later told his watch commander, Defendant Laing, that he had placed Roybal-Smith in the cell around 11:00 p.m. Denver's own records and video show that it was 12:18 a.m.

50. Around the same time, the 2C unit grew loud. In handwritten notes he made after his shift, Defendant Morales wrote that at approximately 12:15 a.m., there was loud banging that went on for approximately an hour Defendant Morales attributed all of the noise to cell 2C-103. Defendant Morales did not check on Mr. Chacon in response to the noise or otherwise.

51. Mr. Chacon was crying out for help. Another man held two cells down from Mr. Chacon in the 2C unit later filed a formal grievance reporting that he heard Mr. Chacon ask for a sergeant on the night of his death and then cry for help all night in his cell until he was finally choked to death while the DSD deputies did nothing. Denver's own summary of that grievance states that deputies ignored the cries for help for a whole hour while Mr. Chacon was in distress.

52. Defendant Morales was steps from Mr. Chacon's cell again and again after the noise began. Between 12:38 and 1:44 a.m., Defendant Morales repeatedly left his desk to go to the end of Mr. Chacon's row or to the cells right beside his. The records reflect none of those visits. From about 1:05 to 1:11 a.m., Defendant Morales stood outside the cells beside Mr. Chacon's. Defendant Morales never looked into Mr. Chacon's cell.

53. Denver's rounds tracker logged checks in the 2C unit under Defendant Morales's name from 12:20 a.m. until 2:12 a.m. But Denver's own video shows Defendant Morales handing the post to Defendant Lukajic and walking out of the 2C unit at approximately 1:54 a.m. After Defendant Morales was gone, the tracker logged a check of the unit's medical-kite box under his name at 2:02 a.m., and then a full round of all eight stations under his name between 2:09 and 2:12 a.m. Denver's records of who checked on the people in its custody that night are wrong and demonstrate the deliberate indifference that Denver, and its officials, show to the inmates in its care.

54. Defendant Morales logged his last round at approximately 1:36 a.m. Defendant Lukajic, who relieved him, made a round between approximately 2:09 and 2:12 a.m. and then returned to the deputy's desk.

55. Another report indicates that in response to a query by paramedics as to the last time Mr. Chacon had been seen awake and moving, Defendant Lukajic shared that he had done a round and did not see anything out of the ordinary.

56. Defendant Lukajic could not have seen much. When deputies responded to cell 2C-102 minutes later, the cell lights were off, and Mr. Chacon was lying on his bunk covered to his neck with a blanket. Defendant Kerbelis did not see the red bruises on Mr. Chacon's neck until he had the cell lights turned on. Denver's own video shows that the lights in cell 2C-102 did not come on until approximately 2:19 a.m., more than two minutes after Defendant Lukajic first walked to the cell door. On information and belief, a deputy glancing through the window of that dark cell could not tell whether Mr. Chacon was breathing.

57. Sound from cell 2C-102 could be heard at the deputy's desk. On information and belief, it was less than twenty-five feet from the deputy's desk. At approximately 2:16 a.m., Defendant Lukajic heard banging on the window of cell 2C-102 from his post, and from there he could see Roybal-Smith at the cell door signaling him to come over. On information and belief, Mr. Chacon's earlier cries for help during the preceding hour were likewise audible to the deputies on post.

58. At approximately 2:17 a.m., only after Roybal-Smith banged on the cell window and reported that Mr. Chacon was choking on an apple, did Defendant Lukajic open the cell. Even then, Defendant Lukajic walked to the cell door, spoke with Roybal-Smith, and walked back to his desk before coming back to open the door. Mr. Chacon was unresponsive. He had no pulse when Defendant Lukajic called the medical emergency. He was already dead.

59. Defendant Kerbelis, as the sergeant responsible for supervising the 2C housing unit, failed in his pre-incident duties. He had no documented supervisory activity in the 2C pod

during the critical overnight hours. He did not review, flag, or direct the correction of the dangerous housing pairing of an unclassified, unscreened, uncooperative, high, and dangerous arrestee (Roybal-Smith) with a Level 4 medium-security detainee (Mr. Chacon), even though Denver's policies make all supervisors responsible for reviewing the classifications of inmates brought to their attention and, when no classification supervisor is available, allow the on-duty supervisor to override the classification deputy's decision for a good cause. He also did not ensure that the deputies doing rounds were looking into every cell or that they were responding to cries from inmates.

60. Had Defendant Kerbelis performed his supervisory duties, either the dangerous housing assignment or the failure to conduct proper welfare checks, or both, would have been detected and corrected before Mr. Chacon was murdered.

61. At approximately 2:18 a.m., Defendant Kerbelis responded to the cell and administered Narcan to the already-dead Mr. Chacon.

62. Deputy Annalissa Reynolds, who had covered the 2C unit during Defendant Morales's break shortly before Roybal-Smith arrived, responded to the emergency. She later reported that she assisted in escorting Roybal-Smith out of the cell. However, no one escorted him out of the cell. At 2:18 a.m., while deputies worked on Mr. Chacon, Roybal-Smith walked out of cell 2C-102 on his own and sat down alone at a table in the dayroom. DSD Deputy Campbell, who arrived moments later, found him sitting at a table and noticed that there were no deputies near him. Deputy Reynolds saw marks on Mr. Chacon's neck. She later handcuffed Roybal-Smith, took him out of the unit, and returned to perform the unit's rounds and download the rounds tracker.

63. Defendant Laing, as the watch commander responsible for the Downtown Detention Center that night, failed in her pre-incident supervisory duties. No documentation reflects that Defendant Laing reviewed or approved the housing decision to place Roybal-Smith, an unclassified, unscreened, uncooperative, high, and dangerous arrestee, in a shared cell with Mr. Chacon. She did not ensure that her subordinate supervisors and deputies were conducting proper welfare checks or that the dangerous housing assignment was identified and corrected. Her failure to exercise meaningful supervisory oversight was a direct cause of Mr. Chacon's death.

64. At approximately 2:55 a.m., Mr. Chacon was pronounced dead. Defendant Diggins, the Sheriff responsible for the policies, training, staffing, and supervision that failed Mr. Chacon, was called out and arrived at the jail in the pre-dawn hours.

**Roybal-Smith strangled Vincent Chacon to death.**

65. Roybal-Smith strangled Vincent Chacon inside cell 2C-102. While speaking with investigators, Roybal-Smith became upset and stated, "I did it. You might as well kill me now."

66. The Denver Office of the Medical Examiner determined that Mr. Chacon died of asphyxia due to external compression of the neck: strangulation. The medical examiner ruled the manner of death a homicide and found that Mr. Chacon's injuries were most consistent with an assault by another person.

67. Mr. Chacon suffered abrasions and contusions of the neck, jawline, and scalp, along with petechiae consistent with strangulation. Multiple DSD deputies who responded to the cell saw the red marks and dark bruising around Mr. Chacon's neck.

68. Roybal-Smith later pled guilty to murdering Mr. Chacon.

**<u>Denver, Defendant Gurulé, and Defendant Clark tried to pass off Vincent Chacon's murder as a choking accident.</u>**

69. At 3:28 a.m. on June 30, 2025, more than an hour after Mr. Chacon was pronounced dead, and after responding officers had already documented visible strangulation bruising on his neck and jaw, Defendant Gurulé sent the official death-in-custody notification to Sheriff Diggins and other senior DSD officials. The notification described Mr. Chacon's death as a choking incident. It did not mention strangulation nor did it mention the bruising that multiple officers had already observed and documented. It did not mention that the Denver Police Homicide Unit had been contacted. The notification perpetuated the false narrative that Roybal-Smith had fabricated at the scene and set the tone for Denver's months-long campaign to characterize Mr. Chacon's murder as an accident.

70. Defendant Gurulé knew better. Throughout the response, Defendant Laing regularly contacted Major Gurule to keep him updated, and she emailed him the profile sheets for both Mr. Chacon and Roybal-Smith. Defendant Laing herself saw dark red bruising around Mr. Chacon's neck. The DSD deputy scribing the scene recorded that the Homicide Unit was called at 3:00 a.m., twenty-eight minutes before Defendant Gurulé sent his notification. And Defendant Gurulé did not even enter the 2C unit until 3:37 a.m., nine minutes after he sent it.

71. DSD waited until 2:48 a.m. to call the police, thirty-one minutes after Defendant Lukajic called the medical emergency. By then, DSD supervisors had seen the bruising on Mr. Chacon's neck, and DSD deputies had handcuffed Roybal-Smith and locked him in a cell in the jail's medical unit. The DSD sergeant who called 911 was not at the scene.

72. When deputies responded to the cell, they reported that Roybal-Smith had told them Mr. Chacon was choking on an apple. For months afterward, Denver told Mr. Chacon's family that his death might have been an accident.

73. Denver's own records refute that story. At approximately 4:20 a.m., the DPD homicide detective who examined Mr. Chacon saw red marks on his neck and discoloration of his eyes that, from his training and experience, were more consistent with manual strangulation, than from choking on a foreign object which in this case was an apple. By 11:25 a.m. that morning, DPD had arrested Roybal-Smith for first-degree murder.

74. Denver kept telling that story to Mr. Chacon's family even after its own officers had arrested Roybal-Smith for murdering Mr. Chacon. On July 1, 2025, Denver's Office of the Medical Examiner performed an autopsy on Mr. Chacon, with a DPD detective present for the entire examination. The autopsy found that Mr. Chacon's upper and lower airways were clear of foreign objects.

75. The next day, July 2, 2025, a representative of Denver's Office of the Medical Examiner, Defendant Megan Clark, called Ms. Hernandez and told her that the medical examiner had found a large piece of apple lodged in her son's trachea and that he had died from choking.

76. She knew that was false. Nothing was lodged in Mr. Chacon's airway. The only apple the medical examiner found inside his body was a fragment in his chest cavity, the origin of which the medical examiner later described as "unclear." Mr. Chacon did not choke. Roybal-Smith strangled him.

77. Denver did not tell Ms. Hernandez that its medical examiner had ruled her son's death a homicide until September 18, 2025. She did not receive his autopsy report until December 2025, more than five months after his death.

78. Mr. Chacon's death was not an accident. Mr. Chacon was strangled to death, in Denver's custody, because Denver locked an unclassified, unscreened, uncooperative, high, and dangerous arrestee in his cell and then failed to protect Mr. Chacon.

**Denver investigated itself and ratified the Individual Defendants' conduct.**

79. Denver's Administrative Investigations Unit ("AIU") reviewed Mr. Chacon's death, including the facility video, the rounds report, and the pod notes, and concluded that there was no policy violation by any Denver official.

80. Denver's AIU reached that conclusion even though it found that a deputy did not change the rounds tracker when he reported for his shift, even though Denver's own rounds system had flagged the first checks after midnight with needing review, and even though Defendant Cordova had housed Roybal-Smith without classifying him, without checking his background, and after he refused every screening question. The AIU got even the basic facts wrong. It reported that Mr. Chacon was taken by ambulance to DHMC. He was not. Mr. Chacon's body was still in the unit, on the floor outside his cell and behind privacy screens, at 3:29 a.m.

81. The Individual Defendants placed an unclassified, unscreened, uncooperative, high, and dangerous arrestee in a cell with a Level 4 non-violent detainee, failed to meaningfully check on him, failed even to accurately document their rounds, ignored his cries for help, and allowed him to be strangled to death. Denver reviewed all of that evidence and concluded that no one had violated any policy. That conclusion is itself powerful evidence of Denver's deliberate indifference to the safety of those in its custody.

**Denver and Defendant Webber repeatedly refused to release records relating to, and the video of, Mr. Chacon's death in violation of Colorado law.**

82. Three days after Mr. Chacon's death, on July 3, 2025, Plaintiffs' counsel sent Denver a written allegation of law enforcement misconduct and a request for the records and recordings of Mr. Chacon's death on behalf of Ms. Hernandez. Counsel emailed the letter to the DSD's Civil Liabilities Unit and to Defendant Webber.

83. The letter invoked C.R.S. § 24-31-902(2)(a), part of Colorado's Enhance Law Enforcement Integrity Act ("ELEIA"), and the Colorado Criminal Justice Records Act ("CCJRA"), C.R.S. § 24-72-301, *et seq.* The letter stated that, pursuant to C.R.S. § 24-31-902(2)(a), Ms. Hernandez was making an allegation of law enforcement misconduct. It asked Denver to provide all body-worn camera footage and other audio and video recordings related to the death of Mr. Chacon within 21 days of the submission of the letter and stated that the letter begins the 21-day period for the release of all unedited video and audio recordings collected or in the possession of Denver.

84. The letter also requested, under the CCJRA, the investigation and incident reports of Mr. Chacon's death, all video recordings relating to his death, all witness interviews, all disciplinary or other responsive actions, all communications within Denver about his death, and his complete inmate file. It asked Denver to preserve all evidence relating to Mr. Chacon's death.

85. The same day, Plaintiffs' counsel sent a separate evidence preservation letter to Mayor Mike Johnston, Defendant Diggins, and Denver's City Attorney. The letter demanded that Denver preserve all video of the incident, including security camera footage and body-worn camera footage. Defendant Diggins personally acknowledged receiving it that day.

86. Under ELEIA, Denver had twenty-one days to release the video. At the time, § 24-31-902(2)(a) provided that, whenever a civilian made "a complaint of peace officer misconduct . . . through notice to the law enforcement agency involved in the alleged misconduct," the agency "shall release, upon request, all unedited video and audio recordings of the incident, including those from body-worn cameras, . . . to the public within twenty-one days after [it] received the request." C.R.S. § 24-31-902(2)(a) (2025).

87. ELEIA also required Denver to give Ms. Hernandez, as Mr. Chacon's parent, the recordings of her son's death. At the time, the statute provided that "[a]ll video and audio recordings depicting a death must be provided upon request to the victim's spouse, parent, legal guardian, child, sibling, grandparent, grandchild, significant other, or other lawful representative." C.R.S. § 24-31-902(2)(b)(I) (2025).

88. ELEIA allowed Denver to delay the release of video only in narrow circumstances, and for only a short period of time. If a video "would substantially interfere with or jeopardize an active or ongoing investigation," Denver could withhold it from the public, but only if "the prosecuting attorney . . . prepare[d] a written explanation of the interference or jeopardy that justifies the delayed release, contemporaneous with the refusal to release the video." C.R.S. § 24-31-902(2)(b)(III) (2025). Even then, Denver had to release the video "no later than forty-five days from the date of the allegation of misconduct." *Id.*

89. Body-worn camera footage of the response to Mr. Chacon's death exists. Denver's medical examiner relied on it in the autopsy report.

90. Denver did not release the video to Ms. Hernandez within twenty-one days. Twenty days after Plaintiffs' request, on July 23, 2025, Defendant Webber denied it in its entirety. She acknowledged that Plaintiffs had requested records, including body-worn camera and other video footage. But she declared that Ms. Hernandez's letter did not qualify as a complaint under the law because there was no complaint pending with the Denver's internal investigatory unit and, therefore, she was not required to release the video footage of the incident. "

91. Nothing in § 24-31-902(2)(a) requires that a complaint of misconduct be pending with the agency's internal investigatory unit. The statute required only "a complaint of peace

officer misconduct by . . . a civilian . . . through notice to the law enforcement agency involved in the alleged misconduct." C.R.S. § 24-31-902(2)(a) (2025). Plaintiffs gave Denver exactly that notice. Defendant Webber invented a requirement that appears nowhere in the statute and used it to withold the video from Mr. Chacon's family.

92. Defendant Webber then refused to release anything at all under the CCJRA. She asserted that releasing "records and evidence from an ongoing homicide investigation and review by the Denver District Attorney" would be "contrary to the public interest," citing C.R.S. § 24-72-305(5). She did not identify a single record, or any portion of any record, whose release would compromise that investigation. By then, DPD had already arrested Roybal-Smith for Mr. Chacon's murder, and Roybal-Smith had already confessed to investigators, "I did it."

93. Denver never invoked the narrow exception outlined in § 24-31-902(2)(b)(III). On information and belief, the Denver District Attorney never prepared the contemporaneous written explanation that the exception requires. And Denver did not release the video within forty-five days of Plaintiffs' July 3, 2025 allegation of misconduct, which the statute required even when an investigation was ongoing.

94. On December 26, 2025, Plaintiffs' counsel sent Denver a notice of claim under the Colorado Governmental Immunity Act, addressed to Mayor Johnston, Defendant Diggins, and Denver's City Attorney's Office. The notice described the DSD deputies' misconduct, including that they placed a dangerous criminal in Mr. Chacon's cell and failed to adequately protest Mr. Chacon. Denver still did not release the video.

**Denver and Defendant Webber stonewalled Mr. Chacon's family for a year and hid the identities of the deputies responsible.**

95. By April 2026, Roybal-Smith had pleaded guilty to murdering Mr. Chacon. On April 15, 2026, Plaintiffs renewed their request. On April 23, 2026, Defendant Webber

acknowledged Roybal-Smith's guilty plea and asked Plaintiffs to confirm that they did not want any records from the DPD. Plaintiffs' counsel responded that the request included all of the documents referenced in the previous request in both DPD and DSD possession.

96. Denver and Defendant Webber still did not produce the records. Plaintiffs' counsel followed up on May 8, 2026, and again on May 14, 2026, reminding Denver that the request had been outstanding since July 3, 2025, and that, with Roybal-Smith's criminal case closed, there was no reason to withhold the records.

97. On May 15, 2026, the DSD's Civil Liabilities Unit told Plaintiffs that it could provide only Mr. Chacon's jail file. It explained that the records of Denver's internal investigation, including the investigation reports, the video, the disciplinary records, and Denver's internal communications, were all in the AIU's file in the custody of the Department of Public Safety. The DSD produced the jail file, with significant redactions, on May 22, 2026.

98. The Department of Public Safety then took more than a month to heavily redact the AIU file. On June 4, 2026, its Chief Compliance Officer wrote that Denver was finishing redactions and would have the records to Plaintiffs within the next few business days. Denver and Defendant Webber still did not provide the records. On June 17, 2026, the Department of Safety's Chief Compliance Officer wrote that Denver was still working on redactions.

99. Denver finally produced the AIU file on June 25, 2026, five days before the one-year anniversary of Mr. Chacon's death. The AIU file had heavy redactions that made parts of it inscrutable. Its redactions concealed the identities of the DSD personnel involved in Mr. Chacon's death, leaving Plaintiffs to guess who had housed Roybal-Smith in Mr. Chacon's cell and who had been responsible for checking on him that night.

100. Colorado law did not permit those redactions. Once an internal investigation that examines a peace officer's on-duty conduct related to an incident of alleged misconduct involving a member of the public is complete, "the entire investigation file, including the witness interviews, video and audio recordings, transcripts, documentary evidence, investigative notes, and final departmental decision is open for public inspection upon request." C.R.S. § 24-72-303(4)(a). Denver was only permitted under the law to redact narrow categories of information, such as personal identifying information, an officer's home address and personal telephone number, and medical information. *Id.* § 24-72-303(4)(b), (c). The names of the deputies whose conduct Denver investigated are not among the categories of data allowed to be redacted y law.

101. Denver and Defendant Webber still did not produce the DPD's records or any body-worn camera footage. On June 26, 2026, Defendant Webber again asserted that there was no complaint of any specific misconduct by a DPD law enforcement officer which is pending with the agency's internal investigatory unit and told Plaintiffs that they would have to submit a new CCJRA request through the DPD's website, which would not accept a request without payment.

102. Denver and Defendant Webber had sat on Plaintiffs' request for nearly a year, and the one-year anniversary of Mr. Chacon's death was two days away. Plaintiffs filed this lawsuit on June 28, 2026. Because Denver had concealed their identities, Plaintiffs had to sue the classification deputy and the deputy responsible for rounds as "J. Doe" and "J. Roe." *See* [ECF #1], ¶¶ 15, 18 & n.1.

**Denver has used its repeatedly refusal to release records relating to, and the video of, Mr. Chacon's death in violation of Colorado law to prevent Mr. Chacon's family from bringing legal claims against its officials.**

103. Denver used its failure to provide Plaintiffs with the records it was required to provide under Colorado law to defend this lawsuit. On September 10, 2026, Denver told this Court that "[t]he one-year statute of limitations of C.R.S. § 13-80-103(1)(c) applicable to the state law negligence claims asserted as the Fifth Claim for Relief against individual sheriff's deputies . . . expired shortly after this action was filed." [ECF #21], p. 2. It argued that amending the complaint to name the deputies it had concealed "would be futile because the one-year statute of limitations has already expired." *Id.*

104. On October 2, 2026, this Court ordered Denver to identify the deputies it had concealed. On October 23, 2026, more than fifteen months after Mr. Chacon's death, Denver disclosed for the first time that Defendant Cordova was the classification deputy who housed Roybal-Smith in Mr. Chacon's cell.

105. That same day, Denver produced twelve clips of facility surveillance video from the 2C unit. Denver still has not produced a single frame of body-worn camera footage. It still has not produced the DPD's homicide investigation file or the witness interviews contained in it.

106. Defendant Webber's refusals in July 2025 and June 2026 rested on the same requirement (found nowhere in the statute) that a complaint of misconduct be pending with the agency's internal investigatory unit before the ELEIA applies. She applied it to the records requested from DSD and to the DPD alike. On information and belief, Denver applies that requirement as a matter of policy, custom, and practice to deny families and their lawyers the video that ELEIA requires Denver to release and does so to prevent families from being able to bring legal claims against Denver.

107. Defendant Webber's decisions were Denver's final decisions made by its final policymaker on the issue of the release of records. Colorado law commits the decision whether to permit inspection of criminal justice records to the discretion of the official custodian. C.R.S. § 24-72-304(1). Denver's Department of Public Safety identified Defendant Webber as its records custodian. On information and belief, no one at Denver reversed her decisions to withhold the records and recordings of Mr. Chacon's death.

108. Denver's stonewalling had consequences. If Denver prevails in its legal argument, its stonewalling will have cost Ms. Hernandez a legal claim against Defendant Cordova, including the right to hold Defendant Cordova personally liable for her willful and wanton conduct without the damages caps of the Colorado Governmental Immunity Act, and to recover exemplary damages that Colorado law does not permit against Denver. *See* C.R.S. §§ 24-10-114(4)(a), 24-10-118(1). But even it if its legal argument fails, Denver's stonewalling also denied Ms. Hernandez what the ELEIA was enacted to ensure: the recordings of her son's death, and timely answers about what Denver's deputies did, and failed to do, while he was being killed. For a year, Mr. Chacon's mother was denied the closure that this information could have been provided, and was instead left to speculate what had happened to her son.

**<u>Denver abjectly failed to train and supervise its deputies.</u>**

109. Denver failed to adequately train its deputies on how to classify inmates, how to make safe housing assignments, how to conduct timely welfare checks, and how to protect detainees from known risks of violence. The need for such training was obvious, and the consequences of failing to provide it were predictable.

110. As described herein, Denver failed to adequately supervise its deputies, including on the night Mr. Chacon was killed, when its deputies disregarded the 35-Minute Well Being

Rule, used a rounds system that never required anyone to check on Mr. Chacon's cell, and failed even to log their rounds accurately. It also failed to ensure that its deputies were properly screening and classifying inmates before housing them with non-violent and non-dangerous inmates.

**Denver's official policy is to lock unscreened arrestees in cells with detainees it has classified as non-dangerous.**

111. Mr. Chacon's death was not the product of one deputy's mistake. Defendant Cordova housed Roybal-Smith without a background check per standard DSD policy, as admitted by Denver itself in a written discovery response.

112. In June 2025, Denver's practice was to send unscreened newly arrested men to the 2C unit, the DDC's intake unit for men. Denver admits that new male inmates were generally given housing assignments temporarily in Pod 2C. Denver does not classify those men when it houses them. Denver admits that an inmate is classified typically within one to three days of receiving a housing assignment and is unclassified until then, and that a classification is assigned following a full background check and generally only after an inmate is arraigned.

113. The 2C unit is not limited to new arrivals. Mr. Chacon had been housed there for three days, and Denver had already classified him, when Denver locked an unclassified, uncooperative, dangerous, and high arrestee in his cell. Under Denver's policy, a single classification deputy decides whether to put a man about whom Denver knows almost nothing into a cell with another detainee, without a background check and without any supervisor's review.

114. Denver knows the danger of these policies, customs, and practices. Its own written policies make it the responsibility of classification deputies to initially classify all inmates brought into the facilities, and require the classification deputy, at intake, to record the

initial classification and housing of each inmate. They require the physical separation of those who may be violent or harmful to themselves or others, require a review of current charges, incident reports, and prior alerts before intake housing decisions, and require a preliminary assessment of the safety and security needs of the facility and the individual before an initial housing assignment. As described below, Denver's own Auditor told Denver years ago that its classification system failed at making suitable housing decisions. Denver has chosen, as a matter of practice, to ignore its written policies and to house unscreened arrestees in shared cells anyway.

115. Denver's rounds system compounds the danger. It does not require deputies to check on any particular cell, and it does not record whether a deputy has looked into any particular cell. And Denver's deputies routinely fail to comply with even that system, as demonstrated by the 2C unit's rounds records for the day before Mr. Chacon was killed.

116. Denver found no policy violation in any of this. That conclusion confirms that locking an unclassified, unscreened, uncooperative, high, and dangerous arrestee in a cell with Mr. Chacon was exactly what Denver's policies and customs permitted.

**Vincent Chacon's death was the foreseeable product of Denver's entrenched custom, policy, and/or practice of deliberate indifference to those in its jails.**

117. Vincent Chacon's death was not an isolated act by a few careless deputies. It was the predictable product of customs, policies, and practices that Denver has cultivated for many years. Through death after death, lawsuit after lawsuit, and audit after audit, Denver has known that the people locked in its jails are not safe. It has chosen not to protect them.

118. On March 11, 2024, a deputy working at the DDC allowed inmates from different groups out of their cells at the same time, leaving their cell doors open. During that time, four inmates got access to the cell of another inmate and brutally assaulted him, causing serious

injuries to his face, neck, and shoulders. During the investigation, the deputy denied having knowledge of or allowing the attack on the inmate to occur. But facility video showed the deputy observing the inmates gathering around the assaulted inmate's cell. Further, the deputy failed to conduct rounds for more than two hours that day. Approximately thirty-three minutes after the assault, when a captain entered the pod to complete a round, he walked past the assaulted inmate's cell but failed to notice that there were multiple inmates gathered in the cell, including some were not wearing appropriate uniforms. By failing to investigate the strange behaviors occurring within the assaulted inmate's cell, the captain failed to notice that the inmate had been injured and required medical attention.

119. In July of 2014, Denver paid Jamal Hunter a $3.25 million settlement to resolve a case involving multiple instances of wrongdoing by Denver and DSD deputies. On July 18, 2011, Mr. Hunter was the victim of a fellow inmate's violent attack that was enabled by the complicity of Deputy Gaynel Rumer, who initially received a mere forty-day suspension. Part of Deputy Rumer's misconduct included failure to conduct proper rounds. Then, on July 31, 2011, Mr. Hunter was attacked and choked by Deputy Edward Keller. This incident was not reviewed, despite Mr. Hunter' filing a grievance about it. During the *Hunter* litigation, the Honorable Judge John L. Kane asked federal authorities in June 2014 to investigate the "patterns and practices" of the Denver police and sheriff's offices and suggested they were intimidating a key witness, saying that a Denver police investigation "smacks of a sham." Denver agreed as part of the *Hunter* settlement to conduct an external review of the DSD, which would consider classification of inmates at the DDC for purposes of placement in pods and cells; the screening and hiring process for DSD deputies; best practices related to the discipline of DSD deputies; and best practices related to the functioning of DSD Internal Affairs Bureau ("IAB").

120. In February 9, 2022, 71-year-old Leroy Taylor died in the DDC after the jail's medical staff ignored his obvious and worsening symptoms, including chest pain, persistent vomiting and diarrhea, inability to swallow, and his visibly blue hands and feet. Deputies reported that Mr. Taylor was barely breathing, delirious, and needed other inmates' help to use the bathroom. He was returned to his cell again and again until he died.

121. In 2008, Denver paid $150,000 to Timothy Thomason, who was forced to spend hours in the DDC without his medication until he suffered a seizure, banging his head on the cement floor of his cell. Mr. Thomason was arrested on charges of cultivating marijuana. While being transported to jail, he informed the officers that he was suffering from terminal Stage IV non-Hodgkin lymphoma, and that he was taking significant amounts of pain killers and anxiety medication. The officers assured him that they would bring his medications to the jail. Once he arrived, however, his repeated pleas for medication were unjustifiably ignored.

122. In 2008, Denver and Denver Health paid a combined $7 million to the family of Emily Rae Rice, who died while in DSD's custody after deputies ignored her cries for help for hours. She was suffering internal bleeding caused by a lacerated spleen and liver. After her death, Denver engaged in investigations which minimized and covered up Denver's failure. Further, deputies involved in Ms. Rice's death lied to investigators without any discipline. Upon information and belief, one of the most culpable DSD Defendants, Faun Gomez, received no disciplinary action for her role, and went on to cause the death of Marvin Booker, as described below. Denver agreed as part of the *Rice* settlement to annually discuss her death at a roll call meeting and to install a system that tracks deputies to ensure they make their rounds, among other measures.

123. In 2018, when one detainee reported that another had threatened to hang himself at the DDC, a DSD deputy responded that the suicidal man would have to ask for help on his own, and did nothing. Further, that deputy lied about receiving an alert about the suicidal treat, and faced no discipline for that lie.

124. Deaths have mounted as a result of Denver's deliberate indifference. Denver recorded ten in-custody deaths in 2021, three in 2022, five in 2023, six in 2024, and at least nine in 2025. They continue unabated. In June 2026, another man died in DSD's custody at the DDC.

**Denver has a custom, policy, and/or practice of allowing the people in its custody to be brutalized and killed.**

125. In 2010, DSD deputies killed Marvin Booker, a houseless street preacher, in the booking area of the DDC. The deputies put Mr. Booker in a carotid chokehold, pressed their weight on his back while he was handcuffed, and tased him, and then failed to provide him any medical care as he died. A federal jury found that the deputies used excessive force, failed to try to save his life, and acted with evil motive or intent, and it awarded his estate $4.65 million, at the time the largest civil rights verdict in Colorado history. The Tenth Circuit affirmed the denial of qualified immunity. The Denver medical examiner ruled Mr. Booker's death a homicide. Denver disciplined no one.

126. In 2012, DSD deputy Brady Lovingier grabbed Anthony Waller, a pretrial detainee who was handcuffed and shackled and quietly addressing the judge at his own advisement hearing, and slammed his head into a glass wall. The unprovoked assault was captured on the courtroom video. A jury found that Deputy Lovingier used excessive force.

127. In 2015, DSD deputies killed Michael Marshall, restraining him face-down during a mental health crisis until he aspirated his own vomit and asphyxiated. Denver paid his family approximately $4.65 million.

128. In 2019, DSD deputy Jason Gentempo punched Serafin Finn, a man who used a wheelchair, flipped him out of it, and smashed his head into the ground. Denver reviewed the beating and concluded that Deputy Gentempo had done nothing wrong. Denver later paid $325,000 to settle Mr. Finn's case. Deputy Gentempo remained on the force, and he was arrested for assaulting another person years later. A Denver official tried to cover up the assault.

**Demonstrating its deliberate indifference to detainee welfare and safety, Denver has been aware of failures in its inmate classification, intake, safety, and housing procedures for over a decade but has refused to fix them.**

129. As early as 2013, Denver's own Office of the Independent Monitor ("OIM") reported that the DSD was not even investigating all allegations of prisoner abuse, as the law required.

130. In 2015, an independent assessment of DSD commissioned by Denver found problems at almost every level, including a near-total lack of accountability when deputies used force against the people in their custody. The assessment made fourteen key findings and 277 recommendations, twenty-seven of which addressed inmate classification, intake, and safety.

131. In January 2018, the Denver Auditor assessed the DSD's progress in implementing those classification, intake, and safety reforms. The Auditor explained that inmate classification serves two purposes that flow directly from the Department's own mission to provide safe and secure custody for those placed in our care: first, making suitable housing decisions, and second, providing important information about the offenders to the deputies who are tending to the inmates on a daily basis. The Auditor found Denver's system deficient at both purposes. The Auditor found that DSD's Jail Management System overwrites old information with new information and does not have the capacity to store or date the old information, so an inmate's history could be lost. And, when a deputy recorded whether an inmate had a history of

assaultive felony convictions, the deputy could enter only a "yes" or a "no" without any way to document information such as past acts or criminal proceedings which informed that entry.

132. Denver continues to fail to address these issues that put detainees in its custody at risk. The OIM's 2025 Semi-Annual Report found that DSD's own internal investigations were so inadequate that the OIM returned 56.2 percent of them for additional work. In other words: when DSD is charged with investigating whether its own deputies violated policy, more than half the time even Denver's designated watchdog cannot accept the result.

133. Denver's response to so many in-custody deaths and an accountability system that fails more than half the time has been to reduce oversight rather than strengthen it. In May 2026, the Denver approved a new DSD directive that removed formal investigations and AIU review for certain categories of deputy misconduct. Under that directive, some policy violations would be handled informally by supervisors, cutting the AIU out of the process entirely. Independent Monitor Lisabeth Pérez Castle responded publicly: the directive was eliminating transparency and accountability. The OIM and Denver's civilian oversight board called for the directive's immediate rescission. Denver has not rescinded it.

134. Denver's own independent watchdog is now being sidelined. The Independent Monitor has stated publicly that the departments are attempting to limit or completely eliminate her office's role in the oversight process. The agency that is supposed to check Denver's conduct is being bypassed. This has resulted in more deaths, less accountability, and less oversight. Denver is not learning from its failures and, instead, is trying to hide them.

**When its deputies harm the people in its custody, Denver protects its deputies.**

135. Denver's response to this violence has been to protect the deputies who inflict it. Denver disciplined no one for killing Marvin Booker. It cleared Jason Gentempo of any

wrongdoing for beating Serafin Finn. It suspended the deputies who facilitated Jamal Hunter's torture for a matter of weeks and then, as a federal judge found, tried to bury the investigation.

136. When Mr. Chacon was strangled to death in a cell Denver never should have placed him in, Denver's AIU concluded that there was no indication of any policy violation.

137. By refusing to hold its deputies accountable, Denver has ratified their conduct and told its workforce that failing to protect the people in its custody carries no consequence.

**Denver's customs, policies, and/or practices were the moving force behind Vincent Chacon's death.**

138. Denver's customs, policies, and practices, and its deliberate indifference to the obvious dangers they created, were the moving force behind the violation of Mr. Chacon's constitutional rights and his death.

139. Had Denver classified and housed the people in its jail safely, conducted timely welfare checks, trained and supervised its deputies, and held accountable those who endangered the people in its custody, Vincent Chacon would be alive today.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment
### Failure to Protect

*Plaintiff Estate of Vincent Chacon Against Denver, Cordova, Morales, Lukajic, Laing, Diggins, and Kerbelis*

140. Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as if fully set forth herein.

141. Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

142. Defendants are "persons" under 42 U.S.C. § 1983.

143. At all times relevant to this Complaint, Vincent Chacon was a pretrial detainee whose rights were protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

144. Each of these Defendants knew of and disregarded an excessive risk to Mr. Chacon's safety.

145. Defendant Cordova created and disregarded that risk by placing Roybal-Smith, an unclassified, unscreened, uncooperative, high, and dangerous arrestee who had just returned from the hospital following a drug-fueled hit-and-run, into cell 2C-102 with Mr. Chacon, a Level 4 medium-security detainee, without any background check and after Roybal-Smith refused to answer a single screening question. Defendant Morales disregarded that risk by locking Roybal-Smith in the cell with Mr. Chacon. Each Defendant should have flagged and prevented this dangerous pairing based on Denver's own classification policies.

146. Defendants Morales and Lukajic, the deputies on post, disregarded that risk by failing to meaningfully check on Mr. Chacon, by passing Mr. Chacon's cell without intervening, and by failing to respond to the noise and Mr. Chacon's cries for help coming from his cell.

147. Defendants Diggins, Laing, and Kerbelis are liable as supervisors. They personally participated in, set in motion, knew of and acquiesced in, and were deliberately indifferent to the policies, customs, and practices that caused Mr. Chacon's death, including the failure to safely classify and house inmates, the failure to conduct timely welfare checks, and the failure to train, supervise, and discipline subordinate deputies regarding each of these duties.

148. As detailed above, Defendant Kerbelis failed to identify or correct the dangerous housing pairing, failed to ensure rounds compliance, and conducted no documented supervisory oversight of the 2C pod before Mr. Chacon was killed.

149. Defendant Laing likewise failed to review or correct the housing decision and failed to ensure that her subordinates were performing timely welfare checks.

150. Defendants knew or should have known that jail officials have a duty to protect the people in their custody from violence at the hands of other inmates.

151. Defendants knew or should have known that a pretrial detainee is entitled to at least the same protection under the Fourteenth Amendment as a convicted prisoner receives under the Eighth Amendment.

152. Defendants knew or should have known that an official violates that duty when the official knows of and disregards an excessive risk to a detainee's health or safety.

153. Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

154. Their pre-incident failures were not mere negligence. They reflected the same systemic deliberate indifference to inmate safety that Denver has tolerated for years.

155. Denver maintained customs, policies, and practices of deliberate indifference to the safety of the people in its custody, including: housing newly arrested, unclassified, and unscreened arrestees in shared cells with detainees Denver had classified as non-dangerous, before conducting any background check; housing dangerous, high-security inmates with vulnerable, low-security detainees; operating a rounds system that does not require deputies to check on any particular cell; allowing its deputies to override housing-restriction warnings in its jail management system without meaningful explanation; failing to conduct timely welfare checks; failing to protect detainees from known risks of inmate-on-inmate violence; and failing to train, supervise, and discipline its deputies regarding these dangers.

156. Denver was deliberately indifferent to the obvious risks created by these customs and practices. Through prior in-custody deaths and assaults, the resulting litigation and settlements, an independent assessment of the DSD, and the Denver Auditor's findings, Denver had actual and constructive notice that its practices endangered the lives of the people in its custody. Denver was deliberately indifferent in its failure to act to rectify these obvious problems.

157. Denver further ratified the unconstitutional conduct of its deputies by reviewing Mr. Chacon's death and concluding that no policy had been violated.

158. Denver's customs, policies, and practices were the moving force behind the violation of Mr. Chacon's constitutional rights and his death.

159. As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

160. Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Mr. Chacon suffered, and other compensatory and special damages.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment**
**Unconstitutional Conditions of Confinement**
*Plaintiff Estate of Vincent Chacon Against Denver, Cordova, Morales, Lukajic, Laing, Diggins, and Kerbelis*

161. Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as if fully set forth herein.

162. Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

163. Defendants are "persons" under 42 U.S.C. § 1983.

164. At all times relevant to this Complaint, Mr. Chacon was a pretrial detainee whose rights were protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

165. At all times relevant to this Complaint, Mr. Chacon was a pretrial detainee. He had not been convicted of any crime, and the Due Process Clause of the Fourteenth Amendment forbade Defendants from subjecting him to any condition of confinement that amounted to punishment.

166. The Fourteenth Amendment required Defendants to provide Mr. Chacon humane conditions of confinement, including reasonable protection of his personal safety, and forbade Defendants from subjecting him to conditions that deprived him of the minimal civilized measure of life's necessities or that posed a substantial risk of serious harm.

167. A pretrial detainee's claim of unconstitutional conditions of confinement arises under the Fourteenth Amendment and is analyzed under the same deliberate-indifference standard that governs an Eighth Amendment conditions claim by a convicted prisoner.

168. Defendants subjected Mr. Chacon to unconstitutional conditions of confinement. Those conditions included housing an unclassified, unscreened, uncooperative, high, and dangerous arrestee, who had just been arrested following a double homicide and a violent, drug-fueled rampage, in the same cell as Mr. Chacon, a Level 4 detainee held on a failure-to-appear warrant for alleged shoplifting; the chronic understaffing of the jail; the systemic failure to

conduct the welfare checks required by Denver's own 35-Minute Well Being Rule, including a rounds system that never required any deputy to check on Mr. Chacon's cell; and the failure to monitor, supervise, and protect the people in Denver's custody. Separately and in combination, these conditions deprived Mr. Chacon of his basic right to personal safety and posed a substantial risk of serious harm to him.

169. Each of the Defendants knew of and disregarded the substantial risk of serious harm that these conditions posed to Mr. Chacon. The risk was obvious.

170. Denver created and maintained these unconstitutional conditions of confinement as a matter of custom, policy, and practice, and was deliberately indifferent to the substantial risk of serious harm they posed, as set forth above. Denver's customs, policies, and practices were the moving force behind the violation of Mr. Chacon's constitutional rights.

171. The conditions to which Defendants subjected Mr. Chacon were not reasonably related to any legitimate governmental objective, were excessive, and amounted to the unconstitutional punishment of a pretrial detainee.

172. Defendants knew or should have known that jail officials have a duty to provide safe conditions of confinement to inmates.

173. Denver maintained customs, policies, and practices of deliberate indifference to the safety of the people in its custody, including: housing newly arrested, unclassified, and unscreened arrestees in shared cells with detainees Denver had classified as non-dangerous, before conducting any background check; housing dangerous, high-security inmates with vulnerable, low-security detainees; operating a rounds system that does not require deputies to check on any particular cell; allowing its deputies to override housing-restriction warnings in its jail management system without meaningful explanation; failing to conduct timely welfare

checks; failing to protect detainees from known risks of inmate-on-inmate violence; and failing to train, supervise, and discipline its deputies regarding these dangers.

174. Denver was deliberately indifferent to the obvious risks created by these customs and practices. Through prior in-custody deaths and assaults, the resulting litigation and settlements, an independent assessment of the DSD, and the Denver Auditor's findings, Denver had actual and constructive notice that its practices endangered the lives of the people in its custody. Denver was deliberately indifferent in its failure to act to rectify these obvious problems.

175. Denver further ratified the unconstitutional conduct of its deputies by reviewing Mr. Chacon's death and concluding that no policy had been violated.

176. Denver's customs, policies, and practices were the moving force behind the violation of Mr. Chacon's constitutional rights and his death.

177. As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

178. Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Mr. Chacon suffered, and other compensatory and special damages.

**THIRD CLAIM FOR RELIEF [1]**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Secs. 20 and 25**
**Failure to Protect**
*Plaintiffs Against Cordova, Morales, Lukajic, Laing, Diggins, and Kerbelis*

179. Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as if fully set forth herein.

180. C.R.S. § 13-21-131 creates a cause of action against a peace officer, as defined in C.R.S. § 24-31-901(3), who, under color of law, subjects or causes any person to be subjected, including by failing to intervene, to a deprivation of individual rights secured by the bill of rights, article II of the Colorado Constitution. Qualified immunity is not a defense to such a claim.

181. Article II, Section 25 of the Colorado Constitution guarantees that no person shall be deprived of life or liberty without due process of law, and Article II, Section 20 prohibits cruel and unusual punishments. Together, these provisions required the Individual Defendants to protect Mr. Chacon, a pretrial detainee in their custody, from a known and obvious risk of serious harm.

182. Each of the Individual Defendants is a peace officer within the meaning of C.R.S. § 24-31-901(3).

183. Acting under color of law, each Defendant subjected or caused Mr. Chacon to be subjected to a deprivation of his rights under Article II, Sections 20 and 25 of the Colorado Constitution.

[1] Plaintiffs bring this claim in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

184. Defendant Cordova subjected Mr. Chacon to that deprivation by placing an unclassified, unscreened, uncooperative, high, and dangerous arrestee who posed an obvious danger in his cell. Defendant Morales did the same by locking that arrestee in the cell with him.

185. Defendants Morales and Lukajic subjected Mr. Chacon to that deprivation by failing to meaningfully check on him and by failing to respond to his cries for help.

186. Defendants Diggins, Laing, and Kerbelis subjected Mr. Chacon to that deprivation by failing to supervise their subordinates' housing decisions and welfare check obligations, thereby failing to protect him from being strangled to death.

187. As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

188. Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered, and other compensatory and special damages.

## FOURTH CLAIM FOR RELIEF [2]
## C.R.S. § 13-21-131
## Colo. Const. Art. II, Secs. 20 and 25
## Unconstitutional Conditions of Confinement

*Plaintiffs Against Cordova, Morales, Lukajic, Laing, Diggins, and Kerbelis*

189. Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as if fully set forth herein.

190. C.R.S. § 13-21-131 creates a cause of action against a peace officer, as defined in C.R.S. § 24-31-901(3), who, under color of law, subjects or causes any person to be subjected,

[2] Plaintiffs bring this claim in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

including by failing to intervene, to a deprivation of individual rights secured by the bill of rights, article II of the Colorado Constitution.

191. Article II, Section 20 of the Colorado Constitution prohibits cruel and unusual punishments, and Article II, Section 25 guarantees that no person shall be deprived of life or liberty without due process of law. Together, these provisions forbade the Individual Defendants from subjecting Mr. Chacon, a pretrial detainee in their custody, to conditions of confinement that amounted to punishment or that posed a substantial risk of serious harm to his safety.

192. Each of the Individual Defendants is a peace officer within the meaning of C.R.S. § 24-31-901(3). Acting under color of law, each subjected Mr. Chacon to unconstitutional conditions of confinement, including housing him with an unclassified, unscreened, uncooperative, high, and dangerous arrestee who posed an obvious danger, the failure to conduct the welfare checks required by Denver's own policy, the failure to monitor and protect him, and the chronic understaffing and supervisory failures described above.

193. These conditions deprived Mr. Chacon of his basic right to personal safety, posed a substantial risk of serious harm to him, and amounted to the unconstitutional punishment of a pretrial detainee in violation of Article II, Sections 20 and 25 of the Colorado Constitution.

194. As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

195. Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered, and other compensatory and special damages.

**FIFTH CLAIM FOR RELIEF**
**Negligence and Negligent Operation of a Correctional Facility**
**Negligent Classification, Supervision, Training, Hiring, and Retention**
*Plaintiff Angela Hernandez Against Defendants Denver, Cordova, Morales, Lukajic, Laing, Gurulé, Diggins, and Kerbelis*

196. Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as if fully set forth herein.

197. Because Mr. Chacon was in the custody of the DSD and wholly dependent on Defendants for his safety, Defendants owed Mr. Chacon a duty to exercise reasonable care to protect him from harm, including harm at the hands of other inmates.

198. Defendants breached that duty.

199. Defendant Cordova negligently housed Mr. Chacon with an unclassified, unscreened, high, and uncooperative arrestee who posed an obvious danger to him, without conducting any background check.

200. Defendants Morales and Lukajic negligently failed to check on Mr. Chacon and negligently failed to respond to his cries for help.

201. Defendants Diggins, Laing, and Kerbelis negligently supervised their subordinate deputies, negligently failed to ensure safe housing decisions were made, and negligently failed to ensure that the 35-Minute Well Being Rule was observed.

202. Denver further negligently operated the Downtown Detention Center and negligently supervised, trained, hired, and retained the deputies responsible for Mr. Chacon's safety.

203. Defendant Gurulé independently breached that duty by negligently and falsely characterizing Mr. Chacon's death as an accidental choking in the official death-in-custody notification, notwithstanding that he knew or should have known, from the information available to him at 3:28 a.m., that responding officers had documented strangulation bruising and that the

Denver Police Homicide Unit had been called. This negligent misrepresentation harmed Ms. Hernandez and other members of Mr. Chacon's family and impeded the investigation and accountability process.

204. Defendant City and County of Denver's sovereign immunity is waived under the Colorado Governmental Immunity Act because Plaintiffs' injuries arise from the operation of a correctional facility and jail. C.R.S. § 24-10-106(1)(b). Because Mr. Chacon was a pretrial detainee who had not been convicted of a crime, the exclusion in C.R.S. § 24-10-106(1.5)(a) for claimants convicted and incarcerated pursuant to such conviction does not apply.

205. The conduct of Defendants Cordova, Morales, Lukajic, Laing, and Kerbelis was willful and wanton, as described herein. Their immunity under the Colorado Governmental Immunity Act is therefore waived pursuant to C.R.S. § 24-10-118.

206. As a direct and proximate cause and consequence of Defendants' negligent acts and omissions, described above, Plaintiffs suffered damages, injuries, and losses as set forth herein, and other compensatory and special damages.

## SIXTH CLAIM FOR RELIEF [3]
## 42 U.S.C. § 1983
## Fourteenth Amendment
## Denial of Access to the Courts

*Plaintiff Angela Hernandez Against Defendants Denver, Gurulé, Clark, and Webber*

207. Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as if fully set forth herein.

208. Defendants Denver, Gurulé, Clark, and Webber acted under color of state law at all times relevant to the allegations in this Complaint.

[3] Plaintiffs bring this claim in good faith for the express purpose of extending and/or modifying existing precedent relating to claims for denial of access to the courts.

209. Defendants Denver, Gurulé, Clark, and Webber are "persons" under 42 U.S.C. § 1983.

210. The Due Process Clause of the Fourteenth Amendment protects Ms. Hernandez's right of meaningful access to the courts. *See Christopher v. Harbury*, 536 U.S. 403, 415 & n.12 (2002).

211. The Supreme Court has described backward-looking access claims as those in which official acts allegedly caused "the loss or inadequate settlement of a meritorious case" or "the loss of an opportunity to sue." *Id.* at 414. Those claims look "backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Id.*

212. Ms. Hernandez has a nonfrivolous claim against Defendant Cordova for negligence and willful and wanton conduct, as set forth in the Fifth Claim for Relief, which Plaintiffs incorporate here as if independently pursued. Defendant Cordova housed Roybal-Smith, an unclassified, unscreened, and uncooperative arrestee who had just been arrested after a violent, drug-fueled rampage, in Mr. Chacon's cell without conducting a background check, and Roybal-Smith strangled Mr. Chacon to death.

213. Defendants Denver, Gurulé, Clark, and Webber intentionally misled, concealed and/or withheld the information Ms. Hernandez needed to pursue that claim.

214. First, Defendant Gurulé negligently and falsely characterized Mr. Chacon's death as an accidental choking in the official death-in-custody notification, notwithstanding that he knew or should have known, from the information available to him at 3:28 a.m., that responding officers had documented strangulation bruising and that the Denver Police Homicide Unit had been called. Defendant Gurulé perpetuated a false narrative about the cause of Mr. Chacon's

death in the official death-in-custody notification he sent to the Sheriff and senior DSD leadership. His characterization of a strangulation homicide as a choking accident, after responding officers had documented the bruising, reflects deliberate indifference to Mr. Chacon's rights and contributed to the institutional cover-up that has impeded accountability for Mr. Chacon's death. This negligent misrepresentation harmed Ms. Hernandez and other members of Mr. Chacon's family and impeded the investigation and accountability process.

215. Then, on July 2, 2025, a representative of Denver's Office of the Medical Examiner, Defendant Megan Clark, called Ms. Hernandez and told her that the medical examiner had found a large piece of apple lodged in her son's trachea and that he had died from choking. She told this to Ms. Hernandez knowing that it was false, or with reckless indifference to the truth or falsity of her statement. Defendant Clark knew or should have known that nothing was lodged in Mr. Chacon's airway. The only apple the medical examiner found inside his body was a fragment in his chest cavity, the origin of which the medical examiner later described as "unclear." Mr. Chacon did not choke. Roybal-Smith strangled him. Defendant Clark's knowing perpetuation of this false narrative was designed to and/or had the effect of misleading Ms. Hernandez in order to delay or hinder her prosecution of legal claims on behalf of her son's estate, and herself. Denver did not tell Ms. Hernandez that its medical examiner had ruled her son's death a homicide until September 18, 2025. She did not receive his autopsy report until December 2025, more than five months after his death.

216. Then, for nearly a year, Defendants Denver and Webber refused to release the records and video of Mr. Chacon's death; invented a requirement found nowhere in C.R.S. § 24-31-902 to avoid releasing the video; withheld the body-worn camera footage entirely; and, when

they finally produced the AIU file five days before the one-year anniversary of Mr. Chacon's death, redacted the identities of the deputies responsible, including Defendant Cordova.

217. Defendants Denver and Webber knew that Mr. Chacon's family anticipated suing those responsible for his death. On July 3, 2025, Plaintiffs' counsel put the Mayor, the Sheriff, and Denver's City Attorney on notice of potential litigation and demanded that Denver preserve all video of the incident, including body-worn camera footage. Defendant Webber acknowledged Plaintiffs' preservation demand on July 23, 2025. On December 26, 2025, Plaintiffs' counsel sent Denver a formal notice of claim. On information and belief, Defendants Denver and Webber also knew that Colorado law imposes a one-year limitations period on actions against sheriffs, police officers, and "any other law enforcement authority," C.R.S. § 13-80-103(1)(c), and they withheld the deputies' identities for the purpose of frustrating, or with deliberate indifference to, Ms. Hernandez's ability to sue them.

218. Defendants' concealment worked. Plaintiffs could not identify Defendant Cordova before the one-year anniversary of Mr. Chacon's death, when Denver contends the limitations period expired. Denver did not disclose Defendant Cordova's identity until October 23, 2026, and only because this Court ordered it to. Denver now contends that Ms. Hernandez's negligence claim against the deputies it concealed is time-barred and that amending to name them is futile. ECF No. 21 at 2.

219. Plaintiffs contend that the Fifth Claim for Relief is timely as to Defendant Cordova because it relates back to the original Complaint and because Denver's concealment tolled the limitations period. Plaintiffs plead this claim in the alternative under Fed. R. Civ. P. 8(d)(2). If the Fifth Claim is time-barred as to Defendant Cordova, Defendants' concealment caused the loss of that claim.

220. That loss cannot be remedied in any other suit. Through the Fifth Claim, Ms. Hernandez could hold Defendant Cordova personally liable for her willful and wanton conduct, without the damages caps of the Colorado Governmental Immunity Act, and could recover exemplary damages from her. C.R.S. § 24-10-118(1). Denver's liability for its employees' conduct cannot replace those remedies, because a public entity "shall not be liable either directly or by indemnification for punitive or exemplary damages." C.R.S. § 24-10-114(4)(a). The remedy Ms. Hernandez seeks through this claim, damages measured by the value of her lost claim against Defendant Cordova, is not available in any other suit.

221. Denver is liable for this violation. Defendant Webber was Denver's final policymaker for Plaintiffs' records requests, and her decisions to withhold and redact the records and recordings of Mr. Chacon's death were Denver's decisions. On information and belief, Denver also maintains a custom, policy, and practice of refusing to release video under C.R.S. § 24-31-902 unless a complaint of misconduct is "pending with the agency's internal investigatory unit," and of delaying, withholding, and redacting the records of deaths in its custody. Those customs, policies, and practices were the moving force behind the violation of Ms. Hernandez's rights.

222. Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Ms. Hernandez's constitutional rights.

223. As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Ms. Hernandez suffered injuries, damages, and losses, including the loss of the value of her claim against Defendant Cordova, and other compensatory and special damages.

**SEVENTH CLAIM FOR RELIEF**
**Colorado Criminal Justice Records Act**
**C.R.S. §§ 24-72-303, 24-72-304, and 24-72-305**
*Plaintiffs Against Defendants Denver and Webber, in Her Official Capacity*

224. Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as if fully set forth herein.

225. The DSD, the DPD, and Denver's Department of Public Safety are criminal justice agencies under C.R.S. § 24-72-302(3).

226. The reports, video and audio recordings, witness interviews, internal investigation file, communications, and other records of Mr. Chacon's death that Plaintiffs requested are criminal justice records under C.R.S. § 24-72-302(4).

227. Defendant Webber is the custodian of those records under C.R.S. § 24-72-302(5) and (8). She decided Plaintiffs' requests on Denver's behalf.

228. Plaintiffs, through counsel, requested inspection of those records on July 3, 2025, and renewed that request on April 15 and April 23, 2026. Defendants denied the request in its entirety on July 23, 2025. They then delayed, redacted, and withheld the records for nearly a year, and on June 26, 2026, they refused to produce the DPD's records without a new, paid request. Defendants have never produced the body-worn camera footage, the DPD's homicide investigation file, or the witness interviews.

229. Defendants' denial was improper. A custodian may deny access on the ground that disclosure would be contrary to the public interest only "unless otherwise provided by law." C.R.S. § 24-72-305(5). Here, the law provided otherwise. Section 24-31-902(2) required Denver to release the video and audio recordings of the incident, and § 24-72-303(4) required Denver to open its completed internal investigation file, including its video and audio recordings, for

inspection, subject only to narrow redactions that do not include the names of the deputies whose conduct Denver investigated.

230. Defendants' denial was also an abuse of discretion. Defendant Webber did not balance the competing interests as to any particular record. She denied the entire request based on a requirement that appears nowhere in C.R.S. § 24-31-902 and a blanket invocation of an ongoing investigation, after DPD had arrested Roybal-Smith and after he had told investigators, "I did it." And Denver continued to withhold the records long after Roybal-Smith had pleaded guilty and any investigation had ended.

231. Defendants' denial was arbitrary and capricious.

232. Plaintiffs are entitled to an order directing Defendants to show cause why they should not permit inspection of the requested records; an order requiring Defendants to permit inspection of the complete and unredacted records, including the body-worn camera footage, the DPD's homicide investigation file, and the complete AIU file; and an award of their court costs and attorney fees. C.R.S. §§ 24-72-303(4)(f), 24-72-305(7).

233. The records are located in the City and County of Denver, within this District. This Court has supplemental jurisdiction over this claim under 28 U.S.C. § 1367(a).

**EIGHTH CLAIM FOR RELIEF[4]**
**C.R.S. § 24-31-902(2)**
**Enhance Law Enforcement Integrity Act**
**Failure to Release Video and Audio Recordings**
*Plaintiffs Against Defendants Denver and Webber, in Her Official Capacity*

234. Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as if fully set forth herein.

[4] Plaintiffs bring this claim in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 24-31-902.

235. The DSD and the DPD are local law enforcement agencies within the meaning of C.R.S. § 24-31-902. The DSD deputies and DPD officers who responded to Mr. Chacon's death are peace officers under C.R.S. § 24-31-901(3).

236. Plaintiffs' July 3, 2025 letter was a complaint of peace officer misconduct by a civilian, through notice to the law enforcement agency involved in the alleged misconduct, and a request for release of the video and audio recordings of the incident. C.R.S. § 24-31-902(2)(a) (2025). Plaintiffs' December 26, 2025 notice of claim gave Denver further written notice of the misconduct, and Plaintiffs renewed their request on April 15 and April 23, 2026.

237. Denver was required to release all unedited video and audio recordings of the incident, including those from body-worn cameras, within twenty-one days after it received Plaintiffs' request, and in no event later than forty-five days after the allegation of misconduct. C.R.S. § 24-31-902(2)(a), (2)(b)(III) (2025).

238. Denver was also required to provide all video and audio recordings depicting Mr. Chacon's death to Ms. Hernandez, his parent, upon request. C.R.S. § 24-31-902(2)(b)(I) (2025).

239. Defendants and Webber violated C.R.S. § 24-31-902(2). They did not release the recordings within twenty-one days, within forty-five days, or at any time before Plaintiffs filed this lawsuit. They withheld the recordings based on a requirement that appears nowhere in the statute. On information and belief, the prosecuting attorney never prepared the written explanation that C.R.S. § 24-31-902(2)(b)(III) requires for any delayed release. Denver and Webber still have not released any body-worn camera footage or the unedited recordings of the incident.

240. Plaintiffs are entitled to a declaration that Defendants violated C.R.S. § 24-31-902(2), and to an injunction requiring Defendants to release all unedited video and audio

recordings of the incident, including all body-worn camera footage of the DSD and DPD response.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against each Defendant, and award all relief allowed by law and equity, including but not limited to the following:

a. Declaratory relief, including a declaration that Defendants Denver and Webber violated C.R.S. § 24-31-902(2) and the Colorado Criminal Justice Records Act;

b. Actual economic damages as established at trial;

c. Compensatory damages, including for past and future pecuniary and non-pecuniary losses, physical and mental pain and suffering, fear, terror, loss of enjoyment of life, loss of liberty, and the wrongful death of Mr. Chacon;

d. Survival and wrongful death damages as permitted by law;

e. Punitive and exemplary damages in an amount to be determined at trial;

f. Equitable and injunctive relief, including but not limited to:

    1. Policy changes designed to prevent future similar misconduct;
    2. Mandatory training designed to prevent future similar misconduct;
    3. An order requiring Defendants Denver and Webber to release all unedited video and audio recordings of the incident, including all body-worn camera footage, as C.R.S. § 24-31-902(2) requires; and
    4. An order requiring Defendants Denver and Webber to permit inspection of the complete and unredacted criminal justice records Plaintiffs requested, including

the complete AIU file and the DPD's homicide investigation file, under C.R.S. §§ 24-72-303(4) and 24-72-305(7);

g. Pre-judgment and post-judgment interest at the highest lawful rate;

h. Attorney fees and costs pursuant to 42 U.S.C. § 1988, C.R.S. § 13-21-131, C.R.S. § 24-72-305(7), and all other applicable law; and

i. Such further relief as justice requires.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 26th day of October, 2026.

NEWMAN | MCNULTY, LLC

*s/ Mari Newman*
Mari Newman
Andy McNulty
Madeline Leibin
1490 N. Lafayette Street, Suite 304
Denver, CO 80218
(720) 850-5770
mari@newman-mcnulty.com
andy@newman-mcnulty.com
madeline@newman-mcnulty.com

**ATTORNEYS FOR PLAINTIFFS**